**In re WRT ENERGY SECURITIES LITIGATION.**

Nos. 96 Civ. 3610(JFK)(JCF),
96 Civ. 3611(JFK)(JCF).

United States District Court,
S.D. New York.

Sept. 28, 2007.

Richard Weiss, January L. Kerr, Milberg Weiss Bershad & Schulman, LLP, New York City, David Kahn, Mark E. King, David B. Kahn & Associates, Ltd., for plaintiffs.

Debra Brown Steinberg, Kevin J. McNamee, Cadwalader Wickersham & Taft LLP, for Schroder & Co., Inc.

James D. Hersclein, Kaye Scholer LLP, New York City, for CIBC Oppenheimer.

*MEMORANDUM AND ORDER*

JAMES C. FRANCIS IV, United States Magistrate Judge.

Lack of frankness in discovery can have unintended and sometimes damaging consequences. This is a consolidated securities fraud action brought by the purchasers of preferred stock or senior notes of WRT Energy Corporation ("WRT"). Because WRT filed for protection under Chapter 11 of the United States Bankruptcy Code and was subsequently discharged in bankruptcy, it is not a named defendant. The defendants do include CIBC Oppenheimer Corp. ("Oppenheimer"), formerly known as Oppenheimer & Co., Inc., and Schroder & Co., Inc. ("Schroder"), formerly known as Wertheim Schroder & Co., Inc. (collectively, the "Underwriter Defendants"). The Underwriter Defendants jointly underwrote WRT's February 1995 public offering of senior notes, which the plaintiffs now challenge as fraudulent. The Underwriter Defendants have moved for the imposition of sanctions against the plaintiffs for failure to supplement interrogatory answers in a timely manner and for the destruction of documents—documents that were at the time in the possession of WRT's successor. For the reasons that follow, the motion is granted.

*Background*

A. *The History of WRT*

WRT was in the business of utilizing advanced technology to revitalize abandoned or shut-in oil and gas wells. In 1995, it sought to raise capital through, among other means, the sale of senior notes. In its Senior Notes Offering Registration Statement effective February 28, 1995 (the " Registration Statement," attached as Exh. 1 to Affidavit of Debra Brown Steinberg dated Jan. 8, 2007 ("Steinberg Aff.")), WRT offered 100,000 units, each consisting of a senior note together with warrants to purchase common stock at a later date. (Registration Statement at 1; Fourth Amended Consolidated Class Action Complaint ("4th Am. Compl."), ¶ 27). Since units were priced at $1,000.00, the offering yielded proceeds of $100 million. (Registration Statement at 1; 4th Am. Compl., ¶ 27).

The Registration Statement made a variety of representations, including the following statement which is of central importance to the current controversy:

> Application of [WRT's] technologies to its existing properties has resulted in substantial increases in overall production rates, oil and gas reserves and cash flow. Since 1987, [WRT] has had an 84% success rate in identifying and developing commercial oil and gas reserves in shut-in wells. For example, in the East Hackberry Field, oil production has been increased by 100% to 1,200 barrels of oil per day since the purchase of one property in February 1994 and the commencement of workover operations on a second property in the field in June 1994. Of the 16 wells on the two properties on which [WRT] conducted workover operations during 1994, production was restored or increased in 14 wells.

(Registration Statement at 3, 39).

Following the senior notes offering, the financial condition of WRT deteriorated. On October 27, 1995, it announced that it would be unable to support its "capital requirements and fund existing debt service and dividends payable on preferred stock." (4th Am.Compl., ¶ 51) (quoting WRT Announcement dated Oct. 27, 1995). Then, on November 14, 1995, the company issued its quarterly report, disclosing that it was unlikely to have sufficient cash to meet the interest payments on the senior notes and could not "continue as a going concern" if current conditions persisted. (4th Am.Compl., ¶ 53) (quoting WRT 3rd Quarter 1995 Form 10–Q). The senior notes, which had sold at $98.50 on August 28, 1995, fell to $68.00 on October 27, then to $50.00 on November 24, 1995. (4th Am.Compl., ¶ 52). On February 14, 1996, WRT filed for bankruptcy protection under Chapter 11 in the United States District Court for the Western District of Louisiana. (4th Am.Compl., ¶ 54). Ultimately, WRT's obligations were discharged and the company was liquidated. (4th Am.Compl., ¶ 54).

B. *Litigation Commences*

On December 18, 1995, the plaintiffs filed two separate class action complaints in the United States District Court for the Southern District of California, alleging claims for

violation of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. §§ 77k, 77l(a)(2), 77o, and the Securities Act of 1934 (the "1934 Act"). These cases were consolidated and transferred to this Court in May 1996. The plaintiffs filed an Amended Complaint on July 26, 1996 and a Second Amended Complaint on October 25, 1996. Extended motion practice then ensued. The defendants moved to dismiss the Second Amended Complaint, and on September 15, 1997, that motion was granted with leave to replead. *In re WRT Energy Securities Litigation*, Nos. 96 Civ. 3610, 96 Civ. 3611, 1997 WL 576023 (S.D.N.Y. Sept. 15, 1997). The plaintiffs duly filed a Third Amended Complaint, and the defendants again moved to dismiss. The Court granted that motion in part on March 31, 1999, dismissing the 1933 Act claims for lack of standing and dismissing the 1934 Act claims against certain of the defendants for failure to plead fraud with the requisite particularity. *In re WRT Energy Securities Litigation*, Nos. 96 Civ. 3610, 96 Civ. 3611, 1999 WL 178749 (S.D.N.Y. March 31, 1999). The plaintiffs then dismissed their 1934 Act claims against the remaining defendants and appealed dismissal of the 1933 Act claims to the Second Circuit. Based on *DeMaria v. Andersen*, 318 F.3d 170 (2d Cir.2003), a case decided while the appeal in this case was pending, the circuit vacated dismissal of the plaintiffs' 1933 Act claims for lack of standing and remanded for consideration on the merits. *In re WRT Energy Securities Litigation*, 75 Fed.Appx. 839, 2003 WL 22221341 (2d Cir.2003). The defendants moved to dismiss the remaining claims, and on February 9, 2005, the Court granted that motion in part and denied it in part. *In re WRT Energy Securities Litigation*, Nos. 96 Civ. 3610, 96 Civ. 3611, 2005 WL 323729 (S.D.N.Y. Feb. 9, 2005). The plaintiffs moved for reconsideration of that decision insofar as it set a limitation on their recovery for losses incurred after a certain date, and the Court granted that motion. *In re WRT Energy Securities Litigation*, Nos. 96 Civ. 3610, 96 Civ. 3611, 2005 WL 2088406

(S.D.N.Y. Aug. 30, 2005). The defendants then sought reargument, but were unsuccessful. *In re WRT Energy Securities Litigation*, Nos. 96 Civ. 3610, 96 Civ. 3611, 2005 WL 3288142 (S.D.N.Y. Dec. 1, 2005). Finally, the Court granted the plaintiffs' motion for class certification on July 13, 2006. *In re WRT Energy Securities Litigation*, Nos. 96 Civ. 3610, 96 Civ. 3611, 2006 WL 2020947 (S.D.N.Y. July 13, 2006).

The Fourth Amended Consolidated Class Action Complaint,[1] now the operative pleading, alleges that the claims asserted by WRT in the Registration Statement concerning its success in revitalizing failed wells were materially incorrect. In particular,

> The Registration Statement[ ] did not disclose that WRT classified any well that produced any level of production as a success, without regard to the cost of the workover or drilling or the amount of production subsequently realized. In general, the vast majority of WRT's newly drilled wells, its "workovers" or "recompletions," and the other attempts to boost production that [WRT] performed during the Class Period on its properties were economic failures because the wells: (i) produced only minimal, commercially insignificant gas or oil flows, or (ii) produced at a commercially viable level for only a short duration (usually just a few months) before dropping to insignificant levels or ceasing to produce altogether. In fact, when costs and production levels are considered, the majority of these wells were failures because they did not pay back the drilling and/or revitalization costs. The cost records and the production results indicate that, on the whole, WRT's drilling and revitalization efforts were never successful and that, during the Class Period, no more than 40% of WRT's wells were economic successes.

(4th Am.Compl., ¶ 36).

C. *Disclosure of the Plaintiffs' Theory of the Case*

Although some initial discovery had taken place before 1999, it was suspended while the

---

1. The claims that survived motion practice and which form the basis of the Fourth Amended Complaint are alleged violations of Section 11 of the 1933 Act. Although claims under Section 15

were dismissed in the February 9, 2005 decision, the plaintiffs have continued to assert them, presumably to preserve their appeal rights.

motions to dismiss were litigated. Discovery resumed in earnest in 2004. On February 13, 2004, Schroder served interrogatories that asked the plaintiffs, among other things, to "[s]tate the source or factual basis, if any, for Plaintiffs' allegations that the Registration Statement was false or misleading and that the Underwriter Defendants did not conduct adequate due diligence in connection with the WRT Senior Notes Offering." (Defendant Schroder & Co., Inc.'s First Set of Interrogatories to Plaintiffs, attached as Exh. 13 to Steinberg Aff., at 4, Interrog. No. 2). The plaintiffs responded in the most general terms, asserting boilerplate objections, referring the defendants to any documents that had been or would be produced in discovery, and contending that any analysis done up to that point was protected from discovery as attorney work product. (Plaintiffs' Response to Defendant Schroder & Co., Inc.'s First Set of Interrogatories to Plaintiffs, attached as Exh. 14 to Steinberg Aff., at 4–5). When the Underwriter Defendants sought the Court's intervention, the plaintiffs reiterated their work product objection and urged that further disclosure would not be appropriate until expert discovery. (Letter of David B. Kahn and Richard H. Weiss dated Jan. 20, 2005, attached as Exh. 15 to Steinberg Aff., at 5–6). Following a pretrial conference, I permitted the defendants to serve more narrowly drawn interrogatories, "specifying their inquiries concerning identification of the wells that plaintiffs contend were falsely described as successfully revitalized." (Order dated Jan. 24, 2005, ¶ 12).

The Underwriter Defendants accepted this invitation and served an interrogatory on January 31, 2005, requesting that the plaintiffs:

State the factual basis for Plaintiffs' allegation that, as of February 28, 1995, "no more than 40% of WRT's wells were economic successes" (Complaint, ¶ 36), including the identification of each well (by name, field, and production date range) that Plaintiffs used in calculating that, as of February 28, 1995, "no more than 40% of WRT's wells were economic successes" (Complaint, ¶ 36); for each such well, state whether Plaintiffs considered it as a success or a failure in determining that, as of February 28, 1995, "no more than 40% of WRT's wells were economic successes" (Complaint, ¶ 36); and state any assumptions used in deriving the "no more than 40% success rate" alleged in the Complaint. (Complaint, ¶ 36).

(Defendant Schroder & Co., Inc.'s Second Set of Interrogatories to Plaintiffs, attached as Exh. 17 to Steinberg Aff., at 3, Interrog. No. 1). The plaintiffs responded, again asserting work product protection, but also stating that the 40% allegation was based on a review of 21 wells set forth in a document called the "Wireline Jobs List Total" (the "Wireline Report"). The plaintiffs stated that WRT had classified all of these well workovers as successful, while the plaintiffs' own analysis showed that only eight (or 38%) were. Although the plaintiffs identified all 21 wells, they did not indicate which they classified as successes and which as failures. (Plaintiffs' Response to Defendant Schroder & Co., Inc.'s Second Set of Interrogatories to Plaintiffs, attached as Exh. 18 to Steinberg Aff. at 4–5).

Another round of motion practice followed, with the plaintiffs renewing their argument that they should not be required to reveal any more of their theory of the case prior to expert discovery. (Letter of David B. Kahn and Richard H. Weiss dated May 18, 2005, attached as Exh. 19 to Steinberg Aff., at 3–5). I rejected this contention and issued the following order:

In response to Defendant Schroder & Co., Inc.'s Second Set of Interrogatories to Plaintiffs, plaintiffs shall indicate which of the 21 previously identified wells they deemed to be failures and which they deemed successes. Further, they shall describe the criteria utilized for categorizing a well as a failure or success and the assumptions used (including date ranges, expense allocation assumptions, and pricing assumptions). Plaintiffs need not provide the actual calculations used in reaching their conclusions.

(Order dated May 24, 2005, ¶ 2). The plaintiffs then submitted a supplemental response dated May 31, 2005, in which they noted that WRT's 84% success rate claim was apparent-

ly based on a handwritten document appended to the Wireline Report, crediting WRT with 79 successes out of a total of 94 workovers. The plaintiffs then stated that they had reexamined 21 of the 79 purported successes and evaluated the revitalizations based on a determination of whether additional commercial quantities of oil or gas were produced sufficient to cover the cost of operating the well and repay the capital expenditures incurred in revitalization. They again listed the 21 wells, this time indicating eight that they considered successes and 13 that they deemed to be failures. They concluded that:

> The foregoing results suggest that WRT's actual success rate was certainly below 40%. For example, one could simply disregard the other revitalized wells WRT classified as successful. Doing so reduces the sample size to the 21 wells examined above and the 15 wells that WRT admitted were failures (a total of 36 wells) rather than the full 94 appearing on the WIRELINE summary page [ ]. Of this smaller sample size, only 22% or 8/36 of the revitalizations were successful. Alternatively, one could extrapolate the results of plaintiffs' re-examination to the entire set of 79 wells WRT classified as successful on the WIRELINE summary page [ ]. Doing so results in only 30 successful revitalizations (38% of the 79 "successes" WRT claimed). This in turn reduces WRT's success rate to 32% or 30/94.

(Plaintiffs' supplemental Response to Defendant Schroder & Co., Inc.'s Second Set of Interrogatories to Plaintiffs, attached as Exh. 12 to Steinberg Aff., at 2–5).

It soon became apparent that the plaintiffs had interpreted Schroder's interrogatory as seeking information not about the plaintiffs' current theory of the case, but only about the basis for the plaintiffs' 40% success rate allegation at the time that they asserted it in the Fourth Amended Consolidated Class Action Complaint. The plaintiffs objected to providing further information on the basis that it would "be a backdoor way of accelerating the due dates for Plaintiffs' (but not Defendants') expert report." (Letter of Mark E. King

dated Sept. 2, 2005, attached as Exh. 21 to Steinberg Aff., at 5–6). I permitted the defendants to propound further interrogatories (Order dated Oct. 6, 2005, ¶ 1), and Schroder did so on October 17, 2005. This time Schroder explicitly requested the basis for the plaintiffs' current success rate theory by asking them to:

> Identify (by well name and field) any well that was erroneously characterized as a success in any disclosure, or in support of any disclosure, contained in the Registration Statement; describe the criteria, methodology, and assumptions that Plaintiffs utilize for categorizing each such well as a failure (including, for example, date ranges, expense and expense allocation assumptions, and pricing assumptions); and, for each well identified as a failure in response to this Interrogatory, state with specificity each Registration Statement disclosure (by page, line, and quotation of the specific disclosure) that is in error as a consequence of Plaintiffs' reclassification of such well as a failure.

(Defendant Schroder & Co., Inc.'s Third Set of Interrogatories to Plaintiffs, attached as Exh. 24 to Steinberg Aff., at 3, Interrog. No. 1).

On October 26, 2005, the plaintiffs responded to Schroder's earlier interrogatory with a second supplemental response. They now categorized as successes two wells that they had previously classified as failures. In addition, they alleged that the handwritten summary attached to the Wireline Report contained an arithmetic error, and that the total number of worked over wells was 97, not 94. (Pl. Exh. 48 (Plaintiffs' second Supplemental Response to Schroder & Co., Inc.'s Second Set of Interrogatories to Plaintiffs) at 2).[2]

On December 5, 2005, the plaintiffs responded to Schroder's Third Set of Interrogatories. They substantially reiterated their prior representations concerning the examination of 21 specific wells from the Wireline Report, identifying 10 as successes and 11 as failures. The plaintiffs again suggested that the results of their analysis of the 21 wells

---

**2.** Unless otherwise indicated, exhibit numbers refer to documents submitted at the evidentiary hearing held in connection with the instant motion on July 24 and 25, 2007.

demonstrated that the 84% success rate asserted in the Registration Statement was false:

> The foregoing results suggest that WRT's actual success rate was materially less than 84%. For example, one could simply disregard the other revitalized wells WRT classified as successful. Doing so reduces the sample size to the 21 wells examined above and the 18 wells WRT admitted were failures (a total of 39 wells) rather than the full 94 [sic] appearing on the WIRELINE summary page [ ]. Of this smaller sample size, only 25.6% or 10/39 of the revitalizations were successful. Alternatively, one could extrapolate the results of plaintiffs' re-examination to the entire set of 79 wells WRT classified as successful on the WIRELINE summary page [ ]. Doing so results in only 38 successful revitalizations (47.6% of the 79 "successes" WRT claimed). This in turn reduces WRT's actual success rate to 39% or 38/97.

(Plaintiffs' Response to Defendant Schroder & Co., Inc.'s Third Set of Interrogatories to Plaintiffs ("Pl. Resp. to Third Interrogs."), attached as Exh. 7 to Steinberg Aff., at 6–7). The plaintiffs also characterized their answer as limited to the information then available and reserved the right to supplement their responses. Specifically, they noted that "[p]laintiffs' evaluation of WRT's success rate is ongoing. Plaintiffs expect to engage a testifying expert who will undertake a further analysis of WRT's actual success rate and submit a detailed report on his findings during the expert phase of discovery in this case." (Pl. Resp. to Third Interrogs. at 1–2, 7).

#### D. *The Gulfport Documents*

During the course of the WRT bankruptcy proceedings, a depository was created to store the voluminous documents that related to the company's business activities. When those proceedings concluded, the depository was liquidated and the documents were returned to various parties, including WRT's successor, Gulfport Energy Corp. ("Gulfport"). In response to applications from the plaintiffs in this action as well as the Underwriter Defendants, the bankruptcy court entered an order requiring that all parties to whom documents were returned preserve them until the entry of final judgment in this case. (Order of The Honorable Gerald H. Schiff, United States Bankruptcy Judge, dated Oct. 23, 2001, attached as Exh. 11 to Steinberg Aff.).

After receiving the plaintiffs' responses to its third set of interrogatories, Schroder issued a subpoena to Gulfport seeking all documents relating to the 11 wells that the plaintiffs had identified in their interrogatory answers as failures. (Subpoena dated Dec. 30, 2005, attached as Exh. 30 to Steinberg Aff.). The plaintiffs then revived a subpoena that they had issued to Gulfport in 2004, but had never enforced, which sought all documents relating to WRT. (Subpoena dated March 22, 2004, attached as Exh. 31 to Steinberg Aff.).

A joint inspection was ultimately conducted at Gulfport's Lafayette, Louisiana warehouse from April 24–26, 2006. Larry A. Barnett, the plaintiffs' oil and gas expert, coordinated the document review for the plaintiffs. According to the attorney in charge of the review for Schroder, approximately 1,100 boxes of documents were made available. (Affidavit of Kevin J. McNamee dated Jan. 8, 2007 ("McNamee Aff."), ¶ 2). The defense team identified and copied only those documents relating to the 11 wells classified as failures in the plaintiffs' December 5, 2006 interrogatory responses and an additional 10 wells relevant to refuting the plaintiffs' contention that the handwritten note attached to the Wireline Report had misrecorded the number of worked over wells. (McNamee Aff., ¶ 3).

According to plaintiffs' counsel, he advised Schroder's counsel shortly thereafter that the plaintiffs might rely on the full universe of WRT wells:

> The last such discussion I had with Defendants' counsel occurred in Houston on April 28, 2006 at the conclusion of [a deposition]. While I and [Schroder's attorney] were collecting and boxing the exhibits used in the examination, I once again informed her that Plaintiffs' testifying expert was going to examine all of WRT's revitalization efforts and identify additional failed

revitalizations beyond those in the Consultant's Preliminary Analysis. [Schroder's attorney] never indicated by her words, expression or actions that my assertion was unexpected or surprising.

(Affidavit of Mark E. King dated Feb. 22, 2007, ¶ 5). Schroder's counsel characterizes the conversation differently. The deposition witness had just testified that each of the wells identified as failures in the plaintiffs' interrogatory answers were in fact successes, and Schroder's attorney suggested that in light of that testimony, the plaintiffs' interrogatory answers were unsupportable and would have to be amended. Plaintiffs' counsel responded that his expert was preparing a report and that changes would be made there. (Affidavit of Debra Brown Steinberg dated March 16, 2007 ("Steinberg Reply Aff."), ¶ 4). Based on the discussion that had preceded plaintiffs' counsel's statement, and based on the plaintiffs' prior supplemental interrogatory response that reduced the number of failed wells from 13 to 11,[3] Schroder's attorney understood that any such modifications would reduce, not expand, the universe of allegedly failed revitalizations. (Tr. at 268–73).[4]

On May 19, 2006, Gulfport's general counsel notified attorneys for both the plaintiffs and the Underwriter Defendants of Gulfport's intention to dispose of the WRT documents. In an e-mail, he wrote:

Gulfport Energy Corp. is in the process of leasing its building and warehouse in Lafayette, Louisiana, and as a consequence of same, we will be destroying/disposing of virtually all of the files you inspected recently in connection with the WRT litigation. We have a group which will be sorting through the files and selecting those files for destruction beginning June 6.

(E-mail of Joel H. McNatt dated May 19, 2006, attached as Exh. 34 to Steinberg Aff.). On June 1, 2006, counsel for the plaintiffs and the Underwriter Defendants participated in a telephone conference regarding Gulfport's communication. At that time, plaintiffs' counsel did not disclose any intention to rely on any allegedly failed wells beyond the 11 identified in their interrogatory answers. (Steinberg Aff., ¶ 2; Affidavit of James D. Herschlein dated Jan. 8, 2007, ¶ 2). Accordingly, without objection from the Underwriter Defendants, plaintiffs' counsel sent an e-mail to Gulfport indicating that the parties in this action had no further interest in the WRT documents in Gulfport's possession. (E-mail of Mark E. King dated June 1, 2006, attached as Exh. 36 to Steinberg Aff.). Sometime in June the documents were destroyed. (Letter of Benjamin E. Russ dated Jan. 3, 2007, attached as Exh. 38 to Steinberg Aff.).

On September 15, 2006, the parties exchanged expert reports. The plaintiffs' report, created by Mr. Barnett, identified an additional 75 wells that he characterized as failures. (Report of Larry A. Barnett on Oil and Gas Issues ("Barnett Report"), attached as Exh. 45 to Steinberg Aff., at 10–13 & Exhs. F, G, H, I). The Underwriter Defendants expressed outrage at learning for the first time that the plaintiffs intended to build their case around a universe of wells beyond those identified in the interrogatory answers. In response, plaintiffs' counsel submitted an affidavit stating:

Plaintiffs and their counsel did not learn of any additional well failures beyond those disclosed in Plaintiffs' Response to Defendant Schroder & Co., Inc.'s Third Set of Interrogatories to Plaintiffs prior to the close of fact discovery. Plaintiffs and their counsel first learned of such additional well failures just days prior to the completion and submission of the Barnett Report on September 15, 2006.

Prior to the exchange of expert reports on September 15, 2006, Plaintiffs never examined any additional well work overs, identified any additional work over failures or made any additional success rate calculations and, consequently, Plaintiffs had nothing additional to disclose on this issue prior to the close of fact discovery.

---

**3.** Apparently by mistake, Schroder's attorney referred to a reduction from 11 to eight failures.

**4.** "Tr." refers to the transcript of the evidentiary hearing held on connection with the instant motion.

(Affidavit of Mark E. King dated Oct. 9, 2006 ("King 10/9/06 Aff."), attached as Exh. 40 to Steinberg Aff., ¶¶ 3, 4).

### E. *The Motion for Sanctions*

The Underwriter Defendants then filed the instant motion. They seek sanctions pursuant to Rules 26(e), 26(g), 37(b)(2), and 37(c)(1) of the Federal Rules of Civil Procedure and under the Court's inherent powers for what they characterize as the plaintiffs' discovery abuses. These alleged abuses fall generally into two categories: the plaintiffs' failure to supplement interrogatory answers in a timely fashion and their failure to prevent the destruction of the WRT documents that had been in the custody of Gulfport. As relief, the Underwriter Defendants seek an order precluding the plaintiffs from relying on their "late-disclosed theory of liability and the 75[w]ells on which it is based," precluding the plaintiffs from supporting their "success rate" claim with reference to any wells other than those identified in their interrogatory answers, and awarding the defendants their costs and attorneys' fees incurred in connection with this dispute. (The Underwriter Defendants' Memorandum Supporting Their Motion for Sanctions to Remedy Plaintiffs' Violation of Court Orders, Unjustified Failure to Supplement Court–Ordered Interrogatory Responses, Evidence Spoliation, and Other Discovery Abuses ("Def.Memo.") at 33–34).

In response, the plaintiffs argue that supplementation of their interrogatory answers by means of the Barnett Report was reasonable because, prior to creation of that report, they had conducted no reliable analysis of the additional 75 failed wells. Further, they contend that spoliation sanctions are unjustified since the Underwriter Defendants were equally capable of assuming control of the WRT documents and had been placed on notice that the plaintiffs were not limiting themselves to reliance on the wells specifically identified in the interrogatory answers. (Plaintiffs' Memorandum of Law in Opposition to the Underwriter Defendants' Motion for Sanctions ("Pl. Memo.")).

A hearing was held on the Underwriter Defendants' motion, and Mr. Barnett testified concerning the process that he engaged in to analyze the success rate of the WRT revitalizations. Plaintiffs' counsel originally hired him as a consulting expert in this case in early 1996. (Tr. at 5–7). Mr. Barnett began his analysis some time after August 1997 (Tr. at 14), though his conclusions were necessarily tentative because he did not have sufficient data at that time. As of March 2005, Mr. Barnett felt most confident in the information he had on the 21–well sample he had selected from the Wireline Report, and so his evaluation of those wells formed the basis of the plaintiffs' response to Schroder's Second Set of Interrogatories. (Tr. at 57–59). In providing the analysis for the plaintiffs' interrogatory responses throughout 2005, Mr. Barnett continued to rely on the same 21 wells, though he revised his evaluation of two of the wells between May and December on the basis of additional information. (Tr. at 62, 76–77). In February 2006, plaintiffs' counsel formally retained Mr. Barnett as a testifying witness. (Tr. at 99–100). As noted above, Mr. Barnett reviewed the Gulfport documents in April and began incorporating that information in his analysis. On May 9 and 10, 2006, he met with plaintiffs' counsel and provided them with a draft expert report. (Tr. at 200, 203–04). Although Mr. Barnett's calculation of WRT's success rate is left blank in the draft, the text anticipated that the rate would be calculated based on the entire universe of 97 wells. Specifically, the draft report states: "The success rate I calculate for the 97 wells is % as compared to the 84% success rate listed in the prospectus." (Pl. Exh. 143 at 2). Mr. Barnett acknowledged that at that point he knew he was going to base his final opinion on all of the wells for which he had obtained or could obtain sufficient data. (Tr. at 204–05). In an affidavit submitted prior to the hearing, he had stated that he did not provide specific success and failure scores for individual wells to plaintiffs' counsel until just a few days before his report was submitted to the defendants on September 15, 2006. (Affidavit of Larry A. Barnett dated Feb. 23, 2007, ¶ 9). However, in response to questioning, Mr. Barnett acknowledged that he had generated a spreadsheet dated April 29, 2006 in which he designated each of the 97

wells as either a success or a failure. (Tr. at 185; Def. Exh. 77). Although unsure of exactly when he provided the spreadsheet to plaintiff's counsel, Mr. Barnett testified that it seems to have been around the time that he met with them on May 9 and 10, 2006. (Tr. at 205–06).

*Discussion*

### A. *Failure to Supplement Interrogatory Answers*

The parties have devoted much of their briefing to the issue of whether the plaintiffs violated prior court orders as well as their obligations under Rule 26(e) of the Federal Rules of Civil Procedure by failing to supplement their interrogatory answers in a timely fashion. The Underwriter Defendants maintain that the plaintiffs have long known that they would base their success rate claims on the entire universe of worked over wells and not merely on the 21–well sample identified in the interrogatory answers. The plaintiffs respond that, because Mr. Barnett was working with an incomplete and ever-changing data base, they did not know precisely what the empirical basis for their success rate analysis would be until he submitted his expert report. Consequently, they argue, that submission was the functional equivalent of the supplementation of discovery, and it was accomplished as soon as was reasonably possible.

This issue need not be decided. If the plaintiffs violated only their supplementation obligation, and if the Gulfport documents still existed, remedies short of preclusion would be sufficient. It would be adequate to reopen discovery to permit the Underwriter Defendants to obtain complete information about the additional 75 wells and perhaps shift the costs incurred in connection with that additional discovery to the plaintiffs. However, since the Gulfport documents have been destroyed, the critical issue is not one of supplementation but of spoliation.[5]

---

5. This is not to say that the interrogatories posed by the Underwriter Defendants and the answers supplied by the plaintiffs are irrelevant. As discussed below, they remain important to deter-

### B. *Spoliation*

### 1. *Liability*

■■ Spoliation is " 'the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.' " *Byrnie v. Town of Cromwell,* 243 F.3d 93, 107 (2d Cir.2001) (quoting *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir.1999)). Where a party violates an order to preserve evidence or fails to comply with an order compelling discovery because it has destroyed the evidence in question, it is subject to sanctions under Rule 37(b) of the Federal Rules of Civil Procedure for failure to comply with a court order. *See Residential Funding Corp. v. DeGeorge Financial Corp.,* 306 F.3d 99, 106–07 (2d Cir. 2002); *Metropolitan Opera Association, Inc. v. Local 100, Hotel Employees and Restaurant Employees International Union,* 212 F.R.D. 178, 219–21 (S.D.N.Y.2003). Rule 37(b) does not apply here since there was no court order requiring the plaintiffs to preserve or produce the Gulfport documents. Nevertheless, "[e]ven in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs." *Residential Funding,* 306 F.3d at 106–07 (citations omitted); *accord Heng Chan v. Triple 8 Palace, Inc.,* No. 03 Civ. 6048, 2005 WL 1925579, at *4 (S.D.N.Y. Aug. 11, 2005); *Metropolitan Opera,* 212 F.R.D. at 220.

■ A party seeking sanctions for the destruction of evidence must establish:

(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed "with a culpable state of mind"; and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

---

mining the degree of the plaintiffs' culpability for the loss of the Gulfport documents and the extent of the prejudice to the Underwriter Defendants.

*Residential Funding,* 306 F.3d at 107 (quoting *Byrnie,* 243 F.3d at 109); *accord Heng Chan,* 2005 WL 1925579, at *4; *Golia v. Leslie Fay Co.,* No. 01 Civ. 1111, 2003 WL 21878788, at *9 (S.D.N.Y. Aug. 7, 2003).

### a. *The Obligation to Preserve Evidence*

■ The "obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation—most commonly when suit has already been filed, providing the party responsible for the destruction with express notice, but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation." *Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir.1998) (citations omitted); *see also Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 436 (2d Cir.2001). "Identifying the boundaries of the duty to preserve involves two related inquiries: *when* does the duty to preserve attach, and *what* evidence must be preserved?" *Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212, 216 (S.D.N.Y.2003) (*"Zubulake IV"*). Here, the duty to preserve attached at least as early as 1996 when the initial complaints were filed, and it plainly applies to the Gulfport documents since they are relevant to the representations of success contained in the Registration Statement.

■ In this case, however, a third inquiry must be added to the "when" and "what" questions identified in *Zubulake IV: who* is responsible for preserving evidence? The Gulfport documents were never in the custody of the plaintiffs; the plaintiffs took no affirmative action to destroy them. These facts, however, are not dispositive.

> If a party cannot fulfill [the] duty to preserve because he does not own or control the evidence, he still has an obligation to give the opposing party notice of access to the evidence or of the possible destruction of the evidence if the party anticipates litigation involving that evidence.

*Silvestri v. General Motors Corp.,* 271 F.3d 583, 591 (4th Cir.2001). In *Silvestri,* the plaintiff was injured in a one-vehicle accident when the borrowed car he was driving hit a utility pole and the air bag failed to inflate. The plaintiff engaged an expert to inspect the vehicle, but he then permitted the owner to have the car repaired before giving any notice to the manufacturer of the claim that he later asserted against it. *Id.* at 585–87. The court upheld dismissal of the complaint as a sanction, finding the plaintiff responsible for the loss of the evidence. *Id.* at 591–95. Similarly, in *Nation–Wide Check Corp. v. Forest Hills Distributors, Inc.,* 692 F.2d 214 (1st Cir.1982), the court endorsed sanctions against a party that had allowed the destruction of relevant documents, even though that party "did not 'destroy' the documents in an orthodox sense; he simply left them for the landlord to destroy." *Id.* at 219. Finally, in *Kambylis v. Ford Motor Co.,* 338 Ill.App.3d 788, 795, 272 Ill.Dec. 697, 788 N.E.2d 1, 6 (1st Dist.2003), the court held that, for purposes of spoliation, "control need not entail actual custody of the evidence if, in fact, such evidence is in the hands of a bailee subject to instruction from the bailor."

> While plaintiff apparently argues that he cannot be held responsible for breaching his duty to preserve evidence when he personally did not destroy the evidence, we see no caveat in the preservation rule for plaintiffs who knew or should have known that the evidence should have been preserved, neglected to preserve it, but did not happen to personally destroy it.

*Id.* at 795–96, 272 Ill.Dec. 697, 788 N.E.2d at 7.

In the instant case, the plaintiffs (and the Underwriter Defendants as well) had functional control of the Gulfport documents since they were advised that the documents would be destroyed and were given the opportunity to take custody of them. Therefore, the preservation obligation attached.

### b. *Culpability*

■ Even where the preservation obligation has been breached, sanctions will only be warranted if the party responsible for the loss had a sufficiently culpable state of mind. *See Residential Funding,* 306 F.3d at 107–08; *Byrnie,* 243 F.3d at 107–09. A party charged with preservation will not be subject to sanctions if, for example, the evidence is destroyed by lightning. But the responsible party need not have acted intentionally or in

bad faith; negligence alone is sufficient to justify the imposition of some sanction. *See Residential Funding*, 306 F.3d at 108; *Heng Chan*, 2005 WL 1925579, at *6–7; *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 431 (S.D.N.Y.2004) (*"Zubulake V"*); *Metropolitan Opera*, 212 F.R.D. at 219. This is because one of the purposes of spoliation sanctions is to prevent the innocent victim from suffering a detriment because of the loss of evidence. Therefore, "each party should bear the risk of its own negligence." *Residential Funding*, 306 F.3d at 108; (*see also Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 75 (S.D.N.Y.1991)). Of course, the nature of the sanction chosen will depend in part on the degree of culpability. *See Residential Funding*, 306 F.3d at 112–13; *Heng Chan*, 2005 WL 1925579, at *6.

■ In this case, the plaintiffs argue that any culpability was shared: that is, that the Underwriter Defendants were equally negligent in permitting the destruction of the Gulfport documents. If that were the case, then no sanction would be warranted. Even if the loss of proof were more detrimental to one party than the other, there would be no basis for attempting to restore the evidentiary balance because either party could have protected itself by preventing the spoliation. This, however, is not a case where the parties are equally culpable.

Throughout the discovery process, the plaintiffs divulged as little as they possibly could about their analysis of WRT's success rate. This culminated with their December 5, 2005 response to Schroder's Third Set of Interrogatories in which they indicated that they had analyzed 21 wells and determined that only 10 had been successfully revitalized. The plaintiffs knew that this was the only specific information that the Underwriter Defendants possessed about the plaintiffs' theory of the case at the time Gulfport inquired about destroying the Lafayette warehouse documents.

At that time the plaintiffs were also well aware that they would in fact be basing their success rate argument on a far greater universe of wells. Mr. Barnett had provided plaintiffs' counsel with a draft expert report that anticipated an analysis of 97 wells. Furthermore, although Mr. Barnett has equivocated on this issue, he had probably also submitted to plaintiffs' counsel a spreadsheet with at least tentative designations of success or failure for each of those 97 wells.

Plaintiffs' counsel thus knew at the time of the destruction of the Gulfport documents that they were going to rely on an analysis of all 97 wells. They also knew that they had informed defense counsel of only 21 wells that had been evaluated. Therefore, it was at least grossly negligent for plaintiffs' counsel to permit the Gulfport documents to be destroyed without specifically warning the Underwriter Defendants that their expert had analyzed all of the wells and would likely present expert opinion regarding all of them.

The plaintiffs attempt to counter this conclusion with two arguments, neither of which is persuasive. First, they point to the fact that they repeatedly stated that they would base their success rate analysis on all of the evidence, and that their analysis would not be complete until they submitted their expert report. These representations, according to the plaintiffs, should have been enough to notify the Underwriter Defendants of the need to review all of the Gulfport documents, or at least to provide for their preservation until the plaintiffs' expert report was served.

I disagree. The Underwriter Defendants' interrogatories were designed to ferret out the plaintiffs' theory precisely so that the defendants could tailor their discovery accordingly. The plaintiffs' boilerplate reservation language does not trump the specific information that they provided concerning their theory. If that were not the case, any effort to narrow the scope of discovery would be meaningless, and a party would be obligated to expend resources seeking information about theories that the adversary never intended to advance. Moreover, any vague "notice" provided by the general language of the reservation was vitiated by the plaintiffs' silence in the face of the imminent destruction of the Gulfport documents.

Second, one of plaintiffs' attorneys asserts that, shortly after the review of the Gulfport documents was conducted, he warned counsel for the Underwriter Defendants that the

plaintiffs might identify additional failed revitalizations. (King 2/22/07 Aff., ¶ 5). I do not credit this representation. Shortly after the destruction of the Gulfport Documents was brought to my attention, this same attorney represented that "[p]rior to the exchange of expert reports on September 15, 2006, Plaintiffs never examined any additional well work overs, identified any additional work over failures or made any additional success rate calculations." (King 10/9/06 Aff., ¶ 4). We now know, however, that Mr. Barnett had provided plaintiffs' counsel with his draft report, and likely also with the spreadsheet showing evaluations for all 97 wells, not merely before the exchange of expert reports, but even before Gulfport notified the parties of its intent to destroy the documents. In light of this misstatement, I also find plaintiffs' counsel's characterization of the conversation with counsel for the Underwriter Defendants less plausible than the version offered by defendants' counsel. While plaintiffs' counsel may have raised the possibility of changing designations for the 21 wells previously disclosed, there is no credible evidence that he specifically warned counsel for the Underwriter Defendants that additional wells were likely to appear in the final analysis.[6]

The plaintiffs, then, lulled the Underwriter Defendants into believing that their success rate theory would be based on a limited sample of the wells. By the time Gulfport alerted the parties of its intent to destroy the documents, the plaintiffs knew that they would in fact present an analysis based on the entire universe of wells. Nevertheless, they permitted the documents to be destroyed without alerting the Underwriter Defendants to their expanded analysis. The plaintiffs are therefore culpable for the loss of the evidence.

### c. *Relevance*

■ Finally, a party seeking sanctions for spoliation must demonstrate that the evidence destroyed was relevant. A moving party may obtain modest sanctions by showing only that the lost evidence was pertinent to its claims. However, where more severe sanctions are at issue, the movant must demonstrate that the lost information would have been favorable to it. *See Heng Chan*, 2005 WL 1925579, at *7 & n. 2. Indeed,

> "[R]elevant" in this context means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence. Rather, the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction.

*Residential Funding*, 306 F.3d at 108–09 (quotation marks, citations, and alterations omitted); *see Zubulake V*, 229 F.R.D. at 431 ("In the context of a request for an adverse inference instruction, the concept of 'relevance' encompasses not only the ordinary meaning of the term, but also that the destroyed evidence would have been favorable to the movant."); *Golia*, 2003 WL 21878788, at *10 (in case where adverse inference imposed, court found that "plaintiffs have established that the [destroyed] documents were relevant, by proffering sufficient evidence from which a jury could conclude that the documents contained evidence that would have been favorable to their claims"). However, the burden placed on the moving party to show that the lost evidence would have been favorable to it ought not be too onerous, lest the spoliator be permitted to profit from its destruction. *See Residential Funding*, 306 F.3d at 109; *Kronisch*, 150 F.3d at 128

---

**6.** The plaintiffs also advance the related argument that counsel for the Underwriter Defendants actually believed that the plaintiffs would rely on all 97 wells but nevertheless allowed the Gulfport documents to be destroyed in order to benefit from the anticipated spoliation sanctions. According to the plaintiffs, "[d]efendants' conduct indicates that these documents are worth more to them dead than alive." (Pl. Memo. at 7). There is no basis for the plaintiffs' conjecture. They have presented no evidence that counsel for the Underwriter Defendants in fact expected to confront an analysis of the full universe of wells. Moreover, it is implausible that competent counsel would allow the loss of relevant, potentially favorable evidence on the chance that they might later benefit from the imposition of sanctions against the opposing party.

("holding the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence would subvert the prophylactic and punitive purposes of the adverse inference, and would allow parties who have intentionally destroyed evidence to profit from that destruction").

 Relevance in this context may be established either through proof of a sufficiently culpable state of mind or by extrinsic evidence. "Where a party destroys evidence in bad faith, that bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to the party." *Residential Funding*, 306 F.3d at 109 (citing *Kronisch*, 150 F.3d at 126; *Byrnie*, 243 F.3d at 110). Likewise, "a showing of gross negligence in the destruction ... of evidence will in some circumstances suffice, standing alone, to support a finding that the evidence was unfavorable to the grossly negligent party." *Id.* Where state of mind evidence is insufficient to serve this function, the moving party may submit other proof tending to demonstrate that the missing evidence would have been favorable to it. *See id.* For example, in *Byrnie*, 243 F.3d at 109–10, the court found that it could be inferred that notes of interviews with the plaintiff which had been destroyed would have supported his claims of discrimination because the defendant's purported reasons for failing to hire the plaintiff were weak. Similarly, in *Zubulake V*, 229 F.R.D. at 437, the court relied in part on surviving e-mails to conclude that deleted e-mails would have been at least as favorable to the party seeking sanctions. *See also Golia*, 2003 WL 21878788, at *10 ("plaintiffs have established that the documents were relevant, by proffering sufficient evidence from which a jury could conclude that the documents contained evidence that would have been favorable to their claims"); *Barsoum v. NYC Housing Authority*, 202 F.R.D. 396, 400–01 (S.D.N.Y.2001) (notes of meeting between employment discrimination plaintiff and supervisor suggested non-discriminatory motive for adverse action, tending to show that audiotape of same meeting that was destroyed by plaintiff would have been unfavorable to her).

In order to evaluate the relevance of the Gulfport documents, it is important to understand the parties' respective theories regarding the success rate issue. The plaintiffs have applied a straightforward cash flow analysis in order to determine whether a well should be deemed a success or a failure. As Mr. Barnett stated in his report:

> I would not have considered any of the well projects a "success" unless they at least produced sufficient quantities of oil and/or gas to generate a positive cash flow after accounting for all expenses related to the project, including necessary capital expenses to restore the well to production, the cost of operating the well, and production and ad valorem taxes. Overhead must also be taken into account because these charges must also be covered before WRT could begin generating cash that could be used to pay the $100 million note.

(Barnett Report at 6–7). By contrast, under the defendants' model, a revitalization might be considered a success on the basis of factors such as the identification of additional reserves, even if the production from that well had not yet generated sufficient cash flow to be deemed a success under the plaintiffs' definition. Thus, the defendants' experts considered "one or more of: (i) increases in production rates; (ii) increases in oil and gas reserves; (iii) increases in cash flow; and (iv) restoration of production, all as a result of well workover operations." (Affidavit of Rawdon J.H. Seager dated Jan. 5, 2007 ("Seager Aff."), ¶ 5).

In light of these differing theories, the Gulfport documents can be grouped into two categories. First, there is information relating to the plaintiffs' cash flow model. According to Mr. Barnett, this includes documents concerning "operating costs, general and administrative overhead costs, prices of oil and gas, and just all sorts of economic information." (Tr. at 109). Mr. Barnett arranged for the copying of some hundred thousand pages of documents of this type. (Tr. at 87–88). Nevertheless, the Underwriter Defendants contend that the plaintiffs should be precluded from using the Gulfport documents in this category because there is

no guarantee that Mr. Barnett preserved all of those that might be relevant:

> There is no way to determine whether Mr. Barnett's team omitted from their selection of Gulfport documents, deliberately or unintentionally, well projects documented in those records. In any event, the defense is not required to accept as definitive the documents plaintiffs elected to preserve and to assume that the documents plaintiffs allowed to be destroyed were irrelevant.

(Letter of Debra Brown Steinberg dated Aug. 17, 2007 ("Steinberg Letter"), at 3). But the burden of demonstrating relevance, though it be a light one, is still on the party seeking sanctions. And, since the sanction of preclusion sought by the Underwriter Defendants is severe, it is their burden to show that the documents lost would have been favorable to them. With respect to the cost-related Gulfport documents, they have not done so.

The second category of Gulfport documents consists of those containing reserve and related data. These documents are central to the Underwriter Defendants' argument that

> [s]uccess, under the exploitation strategy, could involve restoring a shut in well to production, uncovering shut in reserves that could be restored in adjacent wells, increasing the reserves of the well or field, enhancing production in a producing well, lowering operating costs or even adding value by allowing a project to be sold.

(Affidavit of Steven S. McGuire dated Jan. 3, 2007 ("McGuire Aff."), unnumbered ¶ 4). It is undisputed that well production, reserve, and operational data were maintained by WRT. (Deposition of Steven S. McGuire, attached as Exh. K to Steinberg Reply Aff., at 22–25). Since Mr. Barnett did not rely on such information to support his cash flow analysis, he made no effort to preserve those Gulfport documents that contained it. Yet, *any* evidence of increased reserves would be favorable to the Underwriter Defendants given their broad definition of success. Therefore, the Gulfport documents in this category are relevant, and their destruction warrants sanctions.

### 2. Remedy

As a threshold matter, the plaintiffs argue that no remedy is necessary because the Underwriter Defendants were not prejudiced. The plaintiffs maintain that "spoliation does not lie where the charging party previously received an opportunity to inspect the evidence." (Pl. Memo. at 39). However, the cases cited by the plaintiffs for this general proposition, as well as a recent Second Circuit decision in the same vein, are inapposite. In *Fujitsu,* a cargo damage action, the plaintiff retained custody of the damaged container, notified the defendant air carrier of the claim, and later destroyed the container. 247 F.3d at 435–36. The air carrier never contacted the plaintiff to seek an opportunity to inspect the container, nor did it request that the evidence be preserved. *Id.* at 436. Accordingly, the court refused to sanction the plaintiff for spoliation. *Id.* Similarly, in *Indemnity Insurance Co. of North America v. Liebert Corp.,* No. 96 Civ. 6675, 1998 WL 363834, at *6–7 (S.D.N.Y. June 29, 1998), the court imposed modest sanctions but declined to dismiss the complaint where the plaintiff negligently disposed of certain physical evidence. The court found that the defendant as well as third parties had previously inspected the lost items and that the critical information could be obtained from other evidence. *Id.* at *6. Most recently, in *Allstate Insurance Co. v. Hamilton Beach/Proctor Silex, Inc.,* 473 F.3d 450 (2d Cir.2007), the Second Circuit overturned a preclusion order despite the fact that the plaintiffs had failed to preserve evidence. The court found that "not only did the defendant not request that Plaintiffs preserve the [physical evidence, the defendant], through its representative, affirmatively disclaimed any interest in the evidence." *Id.* at 458. None of those cases, however, presented a situation similar to that here. In this case, the plaintiffs rendered the Underwriter Defendants' opportunity to review the Gulfport documents illusory by misleading them with respect to the scope of the plaintiffs' theory of the case. The defendants are therefore entitled to a remedy for the loss of the documents.

■ The appropriate remedy must be fashioned with the following principles in mind:

[T]he applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine. The sanction should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore "the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party."

*West,* 167 F.3d at 779 (quoting *Kronisch,* 150 F.3d at 126) (internal citations omitted). The remedy requested by the Underwriter Defendants—a preclusion order—often serves these goals. *See id.* at 780 (listing preclusion of evidence as one alternative to sanction of dismissal); *Daval Steel Products v. M/V Fakredine,* 951 F.2d 1357, 1366–67 (2d Cir. 1991) (upholding order barring party from presenting evidence opposing claim); *Great Northern Insurance Co. v. Power Cooling, Inc.,* No. 06–CV–874, 2007 WL 2687666, at *14 (E.D.N.Y. Sept. 10, 2007) (precluding party responsible for spoliation from introducing evidence regarding missing or altered parts). It is, indeed, an appropriate sanction here, particularly because it can be tailored to mitigate the specific prejudice that the Underwriter Defendants would otherwise suffer. However, in the process of leveling the playing field, care must be taken not to tilt it too far in favor of the party seeking sanctions. *See M & T Mortgage Corp. v. Miller,* No. 02–CV–5410, 2007 WL 2403565, at *12 (E.D.N.Y. Aug. 17, 2007) (crafting narrow preclusion order to conform to prejudice suffered by victim of spoliation).

■ The Underwriter Defendants seek an order that would preclude the plaintiffs from relying on the Gulfport documents in any respect and would limit the plaintiffs to argument solely on the basis of an extrapolation from the analysis of the original 21 wells. Such an order would sweep too broadly. As discussed above, there is simply no evidence that the voluminous documents Mr. Barnett preserved in connection with the plaintiffs' cash flow analysis present a misleading or materially incomplete picture of the financial history of each of the 97 wells. Provided that the Underwriter Defendants receive full access to these documents, the only burden on them will be the need to review the data, something they would have done in any event if they had adequate prior notice of the plaintiffs' intent to analyze all of the wells.

The reserve and related documents are a different matter. Because Mr. Barnett does not ascribe to the defendants' more encompassing definition of success, he did not review or preserve this information. The Underwriter Defendants, however, did retain the Gulfport documents relevant to the 11 failed wells that the plaintiffs had identified at the time of the document inspection, together with those pertaining to an additional 10 wells. (McNamee Aff., ¶ 3). Therefore, the most appropriate remedy is to preclude the plaintiffs from challenging the representativeness of the reserve information that the defendants ultimately rely upon; thus, to the extent the evidence that the Underwriter Defendants obtained from the Gulfport documents supports their success rate theory with respect to the limited sample of wells, then it will be conclusively presumed that similar results would have obtained for the remainder of the 97 wells if that information were available. Furthermore, because the defendants are prejudiced by being able to present to the jury only evidence concerning a fraction of the wells while the plaintiffs can offer proof about the entire universe, the Underwriter Defendants are entitled to a jury instruction explaining that this asymmetry is a consequence of a loss of evidence for which the plaintiffs were responsible.[7]

There remains a question as to whether the destruction of the Gulfport documents has hindered the Underwriter Defendants with respect to issues other than the success rate dispute. The defendants argue that their causation expert based his analysis on only the 21 wells originally disclosed and would now have to analyze the additional 75 failed wells unless any reliance on those wells

---

7. The precise language of any such instruction is best determined at the time of trial.

is precluded. (Expert Report of Warren W. Cole, attached as Exh. 27 to Steinberg Aff., at 7–8; Def. Memo. at 9–10; Steinberg Letter at 4). Significantly, the Underwriter Defendants do not suggest that their causation expert examined reserve data or other information contained in Gulfport documents that have now been destroyed. Because the prejudice suffered by the defendants is confined to incurring additional expense, it can be remedied without imposing the more draconian remedy of preclusion.

■ Finally, the Underwriter Defendants are entitled to an award of costs, including attorneys' fees. Such a monetary award "may be appropriate to punish the offending party for its actions or to deter [the] litigant's conduct, sending the message that egregious conduct will not be tolerated." *Travelers Property Casualty of America ex rel. Goldman v. Pavilion Dry Cleaners*, No. Civ. A. 04–1446, 2005 WL 1366530, at *4 (D.N.J. June 7, 2005) (citing *United States v. Philip Morris USA, Inc.*, 327 F.Supp.2d 21, 26 (D.D.C.2004); *In re Prudential Insurance Co. of America Sales Practices Litigation*, 169 F.R.D. 598, 615–17 (D.N.J.1997)); *see also Heng Chan*, 2005 WL 1925579, at *10; *Advantacare Health Partners, LP v. Access IV*, No. C 03–04496, 2004 WL 1837997, at *10–11 (N.D.Cal. Aug. 17, 2004). Furthermore, such an award serves the remedial purpose of making the opposing party whole for costs incurred as a result of the spoliator's wrongful conduct. *See Turner*, 142 F.R.D. at 77–78. "[C]ompensable costs may arise either from the discovery necessary to identify alternative sources of information or from the investigation and litigation of the document destruction itself." *Id.* at 78 (internal citations omitted).

In this case, the Underwriter Defendants have incurred costs in connection with this motion which are appropriately shifted to the plaintiffs. The additional cost of any expert analysis of the 75 newly identified well failures is properly borne by the plaintiffs as well. While such investigation would have been conducted at the outset had the defendants been aware of the scope of the plaintiffs' analysis, further costs are generated by the inefficiency of repeating the exercise, and

this, together with the deterrent value, justifies shifting the Underwriter Defendants' increased expert expenses to the plaintiffs. The defendants may therefore file an application to set the amount of costs and fees to be assessed.

*Conclusion*

The motion of the Underwriter Defendants for the imposition of sanctions for the loss of the Gulfport documents is granted. The plaintiffs shall be precluded from contesting the representativeness of the proof that the defendants present to support their success rate theory, and the defendants shall be entitled to have the jury instructed that the reason that they are unable to present evidence with respect to all of the wells is that that evidence was lost as a result of actions or omissions by the plaintiffs. Further, the plaintiffs shall pay the Underwriter Defendants' costs, including attorneys' fees, in connection with this motion, as well as any additional expenses related to expert analysis of the newly identified wells.

SO ORDERED.