CEDAR PETROCHEMICALS,
INC., Plaintiff,

v.

DONGBU HANNONG CHEMICAL
CO., LTD., Kumho P & B Chemicals, Inc., Defendant.

No. 06 Civ. 3972(LTS)(JCF).

United States District Court,
S.D. New York.

Jan. 14, 2011.

John Thomas Lillis, Jr., Thomas Michael Grasso, Kennedy Lillis Schmidt & English, New York, NY, for Plaintiff.

Carolyn Traister Schiff, Robert A. Weiner, Michael Robert Huttenlocher, Jr., McDermott, Will & Emery, LLP, New York, NY, for Defendant.

## MEMORANDUM AND ORDER

JAMES C. FRANCIS IV, United States Magistrate Judge.

Plaintiff Cedar Petrochemicals, Inc. ("Cedar") brings this action against Dongbu Hannong Chemical Co., Ltd. ("Dongbu") in order to recover for the breach of the terms of a sales contract for a quantity of phenol. The defendant now seeks (1) the imposition of sanctions against the plaintiff for failing to preserve samples of the phenol at issue and (2) the exclusion of evidence proffered by the plaintiff, including testimony, reports, a declaration from two expert witnesses, and an affidavit from another witness. For the reasons that follow, the defendant's motions are denied.

### Background

This case revolves around a contract for the sale and delivery of approximately 2000 metric tons of liquid phenol. (Second Amended Complaint ("2d Am. Compl."), ¶ 1). Under the contract, dated May 17, 2005, Dongbu, a Korean corporation, agreed to deliver the phenol from the manufacturer to a ship called the Bow Flora in the port of Ulsan, South Korea, where Cedar would take possession of it. (Contract No. T250–P1–0505NYC ("Contract"), attached as Exh. 1 to Declaration of Cho Yong dated Sept. 10, 2010 ("Cho Decl."); 2d Am. Compl., ¶¶ 20, 25–29). The contract incorporated by reference the manufacturer's "Guaranteed Sales Specs," which called for the color of the phenol to be a maximum of five Hazen units on the Platinum–Cobalt scale at delivery; subsequently, both parties agreed to an amended maximum color of ten Hazen units. (Cho Decl., ¶¶ 10, 15–16, 19, 22; Contract; The

Specification of Phenol, attached as Exh. 2 to Cho Decl.; Letter of Credit dated May 18, 2005, attached as Exh. 7 to Cho Decl.). The contract further stated that inspection of the phenol would be carried out by a "mutually acceptable/independent surveyor whose findings as to quantity/quality as per shoretank figures at loadport are final and binding on both parties." (Contract).

On or about May 21, 2005, the phenol was loaded from the manufacturer's shore tanks onto the Green Pioneer, a ship chartered by the manufacturer, in the port of Yosu, South Korea. (Declaration of Hao–Lin Chu dated Feb. 2008 ("Chu Decl."), attached as Exh. 4 to Omnibus Affidavit of Carolyn Traister Schiff dated July 30, 2010 ("Schiff Aff."), ¶ 11). At that time, two independent surveyors—SGS Korea Co. Ltd. ("SGS Korea"), which had been hired by Cedar, and Global Surveyors and Inspectors Ltd. ("GSI"), which had been hired by the manufacturer—drew samples of the phenol from the manufacturer's shore tanks, which they tested and found to be within the specified color range. (Chu Decl., ¶¶ 10–11; GSI Certificate of Analysis dated May 24, 2005, attached as part of Exh. 1 to Omnibus Affidavit of John T. Lillis, Jr., dated Sept. 13, 2010 ("Lillis Aff."); SGS Korea Certificate of Quality dated May 24, 2005, attached as part of Exh. 1 to Lillis Aff.; SGS Korea Certificate of Analysis dated May 24, 2005, attached as part of Exh. 1 to Lillis Aff.). GSI also drew two samples of the phenol from the Green Pioneer's tanks, delivering one sample to the manufacturer and retaining the second sample. (GSI Sample Report dated May 20, 2005, attached as part of Exh. 1 to Lillis Aff.).

The phenol was shipped from Yosu to Ulsan, where on May 24, 2005 it was transferred from the Green Pioneer onto the Bow Flora. (Chu Decl., ¶ 12; SGS Korea Time Report dated May 24, 2005, attached as part of Exh. 1 to Lillis Aff.). The independent surveyors sampled and tested the phenol several times as it was pumped between the Green Pioneer and the Bow Flora, and found it to be below the specified maximum for color at each test. (Chu Decl., ¶ 12; SGS Korea First Foot Certificate of Analysis dated May 24, 2005, attached as part of Exh. 1 to Lillis Aff.; SGS Korea Vessel Tank Certificate of Analysis dated May 24, 2005, attached as part of Exh. 1 to Lillis Aff.). GSI drew two extra samples of the phenol from the Bow Flora's tank, delivering one sample to the manufacturer and retaining the second sample. (GSI Sample Report dated May 24, 2005, attached as part of Exh. 1 to Lillis Aff.). SGS Korea drew a total of nine samples in Ulsan: four from the Green Pioneer and five from the Bow Flora. (SGS Korea Sample Report dated May 24, 2005 ("SGS Korea Sample Report"), attached as part of Exh. 1 to Lillis Aff.). Three of the samples were sent to SGS's lab for immediate analysis; two of the samples were placed on the Bow Flora to travel with the cargo; and four of the samples were retained by SGS. (SGS Korea Sample Report). The Sample Report generated by SGS indicated that the samples would "be retained only 90 days unless written instruction to the contrary" was received. (SGS Korea Sample Report).

Nearly two months later, on or about July 19, 2005, the phenol arrived via the Bow Flora in Rotterdam, the Netherlands, where tests revealed that its color had degenerated to over 500 Hazen units, a value significantly above the maximum specified by the parties' contract. (2d Am. Compl., ¶¶ 47–48; SGS Netherlands Analytical Report 62681–022513–1–02–D, dated July 20, 2005, attached as part of Exh. 1 to Lillis Aff.). Subsequent testing of the phenol by SGS Nederland B.V. ("SGS Netherlands") confirmed that it had gone substantially off-color. (2d Am. Compl., ¶ 51;

SGS Netherlands Analytical Reports 62681–022750–1–01, 62681–022750–1–02, 62681–022750–1–03, and 62681–022750–1–05, dated July 28, 2005, attached as part of Exh. 1 to Lillis Aff.).

On July 29, 2005, SGS Netherlands carried out an analysis in its laboratory of samples of the phenol drawn in Rotterdam, as well as the samples that had been drawn in Ulsan and retained on the Bow Flora (the "Rotterdam Samples"). (2d Am. Compl., ¶ 52; SGS Netherlands Witnessing Report dated July 29, 2005 ("SGS Netherlands Witnessing Report"), attached as part of Exh. 1 to Lillis Aff.).[1] The tests indicated that all nine samples were well above the specified maximum color value, although the samples taken in Rotterdam were substantially further from the maximum than most of the samples drawn earlier. (SGS Netherlands Analytical Results). A report issued to the end buyer of the phenol by SGS Netherlands for the period July 19–22, 2005 indicated that "[a]ll samples drawn in relation to the above inspection will be kept in retain [sic] for a period of three months unless otherwise agreed." (SGS Netherlands Discharge Report dated July 25, 2005, attached as part of Exh. 1 to Lillis Aff., at 2).

On July 21, 2005, Cedar's representative in South Korea notified Dongbu that the phenol had tested off-specification in Rotterdam and that Cedar was holding Dongbu responsible for the discolored phenol. (Cho Decl., ¶ 25; Chu Decl., ¶ 15; E-mail of Cho Yong dated July 21, 2005 ("Cho E-mail 7/21/05"), attached as Exh. 10 to Cho Decl.; Letter of Dongbu Hannong Chemical Co., Ltd. dated July 21, 2005 ("Dongbu Letter 7/21/05"), attached as Exh. 11 to

Cho Decl.). The parties subsequently arranged a joint analysis of the samples that had been drawn and retained in Ulsan (the "Ulsan Samples"). (2d Am. Compl., ¶ 54; Cho Decl., ¶¶ 26–27; E-mail of Cho Yong dated Aug. 4, 2005, attached as Exh. 12 to Cho Decl.; E-mail of Cho Yong dated Aug. 4, 2005, attached as Exh. 13 to Cho Decl.). The joint analysis, which was carried out in the SGS Korea laboratory on August 8, 2005, was attended by, among others, representatives of Dongbu, Cedar, and the consulting firm Minton, Treharne & Davies ("MTD"). (2d Am. Compl., ¶¶ 57–68; Cho Decl., ¶¶ 28–35; SGS Korea Analytical Report dated Aug. 8, 2005 ("Aug. 8 Report"), attached as part of Exh. 1 to Lillis Aff.), The analysis revealed that one of the retained samples drawn from the Bow Flora and the retained sample drawn from the Green Pioneer were well off-specification for color; that one of the retained samples drawn from the Bow Flora (which had been drawn as the phenol was being transferred between the Green Pioneer and the Bow Flora) was at the agreed-upon maximum specification for color, 10 Hazen units; and that the retained sample drawn from the shore tanks before the phenol was loaded onto the Green Pioneer had remained on-specification, yielding a result of between 3 and 5 Hazen units. (Aug. 8 Report). The sample drawn from the Green Pioneer was observed to contain small particles of an unidentified substance, while the other samples were all determined to be "[c]lear free from suspended matter." (Aug. 8 Report). All of the parties in attendance at the joint anal-

---

1. The Rotterdam samples included five samples from the tanks of the Bow Flora (two drawn by the ship's crew, one drawn by GSI, one drawn by SGS Korea, and one drawn by SGS Netherlands); two samples from the tanks of the Green Pioneer (one drawn by GSI and one drawn by SGS Korea); and two

from the shore tanks into which the phenol was unloaded in Rotterdam (both drawn by SGS Netherlands). (SGS Netherlands Analytical Results dated July 29, 2005 ("SGS Netherlands Analytical Results"), attached as part of Exh. 1 to Lillis Aff.; SGS Netherlands Witnessing Report).

ysis signed the analytical report prepared by SGS Korea. (Aug. 8 Report).

On May 24, 2006, Cedar commenced the instant action. (Complaint). After substantial discovery and numerous disputes, the defendant filed a Motion for Summary Judgment, a Motion for Sanctions for the Spoliation of Evidence, and a Motion in Limine to Exclude the Expert Reports of Martin East and John Minton. (Schiff Aff., ¶ 1). The defendant then filed a Cross–Motion for Summary Judgment. (Notice of Cross–Motion). Finally, the plaintiff filed a Motion to Strike the Declaration of Martin East and the Gijbels Affidavit. (Notice of Motion to Strike the Declaration of Martin East and the Gijbels Affidavit). This decision addresses all of the pending motions except those seeking summary judgment.

*Discussion*

A. *Exclusion of Evidence*

Dongbu challenges various pieces of evidence submitted to this Court by the plaintiffs. First, Dongbu argues that the June 3, 2010 supplemental report of the plaintiff's expert John Minton should be precluded because it was filed outside the time frame for submission of expert reports and is not an appropriate supplemental report. (Defendant Dongbu Hannong Chemical Co., Ltd.'s Memorandum of Law in Support of Motion to Exclude the Testimony and the Expert Reports of Martin East and John Minton ("Experts Memo.") at 23–24). Second, Dongbu argues that the declaration of the plaintiff's expert Martin East dated September 13, 2010 should be excluded because (1) it was not served during the window for expert discovery in this case and (2) "it provides testimony regarding matters that are outside the scope" of Mr. East's submitted expert report. (Defendant Dongbu Hannong Chemical Co., Ltd.'s Memorandum of Law in Support of Motion to Strike the Declaration of Martin East and the Gijbels

Affidavit ("Motion to Strike Memo.") at 1). Third, Dongbu argues that the Affidavit of Erik Gijbels dated March 11, 2010 should be excluded because it was not timely filed or served pursuant to Local Rule 6.1. (Motion to Strike Memo. at 1, 9). Finally, Dongbu argues that all of the reports and deposition testimony of the plaintiff's expert witnesses should be excluded from evidence because, among other reasons: (1) the expert witnesses are not sufficiently expert in "chemistry or phenol discoloration"; (2) they have not sufficiently analyzed the phenol at issue in this case; (3) they did not use all the available data in reaching their conclusions; and (4) their "conclusions are impermissibly speculative, inconclusive and therefore unreliable." (Experts Memo. at 1–2). I will address each of these arguments and then proceed to address Dongbu's Motion for Sanctions for the Spoliation of Evidence utilizing only evidence that has been deemed admissible.

1. *Preclusion of Expert Report*

■ As will be discussed below, Dongbu contends that all of Cedar's submitted expert reports and expert testimony should be excluded from the record. However, Dongbu argues in particular that a supplemental report prepared by one of the plaintiff's experts, John Minton, in which he describes some of the chemistry underlying the discoloration of phenol and attaches a list of chemistry sources that ostensibly support his explanation, should be excluded on grounds unique to that report. (Experts Memo. at 23–24; MTD, Report on "The Discolouration of Phenol During Shipment and Storage" dated June 3, 2010, attached as Exh. 14 to Schiff Aff.). The report was submitted following an exchange at Mr. Minton's deposition during which counsel for Dongbu challenged the basis for some of Mr. Minton's conclusions and suggested that a space be left in the

deposition transcript where he could "fill in the chemical references for phenol and seeding." (Deposition of John E. Minton dated May 3–4, 2010, attached as Exhs. 5–6 to Lillis Aff. ("Minton Dep. I"),[2] at 219). Dongbu contends that this report, submitted more than four months after all expert reports were to have been submitted and approximately one month after Mr. Minton's deposition concluded (Experts Memo. at 23; Memorandum Endorsement dated Oct. 29, 2009), is untimely and should be precluded because it "serves no other purpose than to bolster and/or attempt to fix the inadequacies of the prior Minton Report" and because "Dongbu is prejudiced by the Supplemental Report" (Experts Memo. at 24).

Under Rule 26 of the Federal Rules of Civil Procedure, expert witnesses must submit a written report that includes, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them [and] the facts or data considered by the witness in forming them." Fed.R.Civ.P. 26(a)(2)(B); *accord Point Productions A.G. v. Sony Music Entertainment, Inc.,* No. 93 Civ. 4001, 2004 WL 345551, at *8 (S.D.N.Y. Feb. 23, 2004). Rule 26(e) requires that "[a] party who has made a disclosure under Rule 26(a) . . . must supplement or correct its disclosure . . . if the party learns that in some material respect the disclosure . . . is incomplete or incorrect." Fed.R.Civ.P. 26(e)(1). Rule 37(c)(1) provides sanctions for failure to comply with these provisions, holding that a party that fails to disclose or amend is not allowed "to use that information . . . to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed.R.Civ.P.

37(c)(1); *accord Point Productions A.G.,* 2004 WL 345551, at *9.

Dongbu correctly notes that "experts are not free to continually bolster, strengthen, or improve their reports by endlessly researching the issues they already opined upon, or to continually supplement their opinions." *Sandata Technologies, Inc. v. Infocrossing, Inc.,* Nos. 05 Civ. 9546, 06 Civ. 1896, 2007 WL 4157163, at *6 (S.D.N.Y. Nov. 16, 2007). If an expert's report "does not rely [on] any information that was previously unknown or unavailable to him," it is not an appropriate supplemental report under Rule 26. *Lidle v. Cirrus Design Corp.,* No. 08 Civ. 1253, 2009 WL 4907201, at *5–6 (S.D.N.Y. Dec. 18, 2009) ("*Lidle I*"). However, "preclusion of an expert report can be a harsh sanction." *Sandata Technologies, Inc.,* 2007 WL 4157163, at *7. In determining whether preclusion is appropriate, courts must consider: (1) the reasons for the delay in providing the evidence; (2) the importance of the evidence precluded; (3) the prejudice to the opposing party from having to address the new evidence; and (4) the possibility of a continuance. *See Softel, Inc. v. Dragon Medical and Scientific Communications, Inc.,* 118 F.3d 955, 961 (2d Cir.1997); *Outley v. City of New York,* 837 F.2d 587, 590–91 (2d Cir. 1988); *Lidle I,* 2009 WL 4907201, at *6; *Point Productions A.G.,* 2004 WL 345551, at *9. "Before the extreme sanction of preclusion may be used by the district court, a judge should inquire more fully into the actual difficulties which the violation causes, and must consider less drastic responses." *Outley,* 837 F.2d at 591.

In view of these principles, it is not appropriate to preclude Mr. Minton's supplemental report. Although the report

---

**2.** Because the plaintiff and the defendant have submitted different excerpts from the depositions of Mr. Minton and Mr. East at various times, references are labeled "Dep. 1," "Dep. 2," and "Dep. 3," depending on who submitted the portion cited and when.

does not rely on previously unknown information, and thus is not a "supplemental" report under Rule 26, it was submitted at the explicit suggestion of the defendant's attorney. Furthermore, the information submitted by Mr. Minton in this report is extraordinarily technical and is not critical to determining the admissibility of his testimony nor the ultimate issues in this case. Although want of importance weighs against the plaintiff under a preclusion analysis, it also weighs in the plaintiff's favor to the extent that the defendant is not unduly prejudiced by the admission of a report that responds to its direct request but is not otherwise central to the plaintiff's case. Mr. Minton's report is more explicit about the chemistry upon which he based his initial conclusions, but he "did not alter this position" and "did not include a new opinion which had not been previously disclosed." *Lore v. City of Syracuse,* No. 5:00–CV–1833, 2005 WL 3095506, at *4 (N.D.N.Y. Nov. 17, 2005). Because this supplemental submission is harmless, the report will not be precluded.

2. *Motion to Strike the Declaration of Martin East*

■ Dongbu seeks further relief under Rule 37(c)(1) for what it contends is the improper submission under Rule 26 of a declaration by the plaintiff's expert witness Martin East. (Motion to Strike Memo. at 3–9; Declaration of Martin East dated Sept. 13, 2010 ("East Declaration")). Dongbu argues that this declaration should be precluded because it was untimely filed and is outside the scope of Mr. East's original report. (Motion to Strike Memo. at 3–6). In response, Cedar argues that the East Declaration "advances no new theory or evidence," that its introduction would be "harmless," and therefore that preclusion under Rule 37 would be inappropriate. (Memorandum of Law in Opposition to Dongbu's Motion to Strike the East and Gibjels [sic] Declarations ("Motion to Strike Opp. Memo.") at 1, 5).

■ Pursuant to Rule 26 of the Federal Rules of Civil Procedure, courts will not admit supplemental expert evidence following the close of discovery when it "expound[s] a wholly new and complex approach designed to fill a significant and logical gap in the first report," as doing so "would eviscerate the purpose of the expert disclosure rules.'" *United States v. Vulcan Society, Inc.,* 637 F.Supp.2d 77, 107 (E.D.N.Y.2009) (quoting *Point Productions A.G.,* 2004 WL 345551, at *9). However, to the extent that an expert affidavit is within the scope of the initial expert report, it is properly submitted in conjunction with dispositive motions even outside the time frame for expert discovery. *See Lidle ex rel. Lidle v. Cirrus Design Corp.,* No. 08 Civ. 1253, 2010 WL 2674584, at *7 n. 4 (S.D.N.Y. July 6, 2010) (*"Lidle II"*) (allowing affidavits from plaintiff's experts "submitted ... in opposition to summary judgment" because affidavits supported experts' initial positions); *Commercial Data Servers, Inc. v. International Business Machines Corp.,* 262 F.Supp.2d 50, 61 (S.D.N.Y.2003) (finding expert affidavit may be considered on motion for summary judgment where it is "substantially similar" to expert report). Thus, "where an expert's affidavit provides evidentiary details for an opinion expressed in his expert report, those portions of his or her affidavit can be considered." *Lidle II,* 2010 WL 2674584, at *7 n. 4; *accord Emig v. Electrolux Home Products Inc.,* No. 06 Civ. 4791, 2008 WL 4200988, at *3 & n. 3 (S.D.N.Y. Sept. 11, 2008) (allowing expert affidavit that "offers more information and elaboration on opinions previously expressed" in expert report).

Here, the East Declaration can fairly be said to "provide evidentiary details" for the conclusions originally espoused in Mr. East's report—which remain unchanged—and is thus properly within the scope of that report. Dongbu argues that "[u]nlike

any of the prior 'expert' reports, ... this declaration describes Mr. East's background." (Motion to Strike Memo. at 4; East Declaration, ¶¶ 5–13). But Mr. East's curriculum vitae was attached to his expert report, and he discusses it (albeit briefly) in the report. (Curriculum Vitae of Martin David East ("East C.V."), attached as Appx. 2 to Report of Martin East dated June 23, 2009 ("East Report"), attached as Exh. 10 to Schiff Aff.; East Report, ¶¶ 1.1–1.3).[3] More substantively, Dongbu argues that the East Declaration introduces new material to the extent that it describes "an elaborate inspection that is a protocol purported required by 'internationally agreed regime[s]' of inspection." (Motion to Strike Memo. at 4, 5) (alteration in original). The paragraphs cited by Dongbu in support of this contention are properly described as providing "evidentiary details" regarding the joint analysis, which undergirds Mr. East's conclusion— as stated in his report—that the results of that analysis demonstrate approximately when and where the phenol became discolored. (East Report, ¶¶ 7.2–7.5; East Declaration, ¶¶ 14–25). In his report, Mr. East refers to "international inspection compan[ies]" that follow "internationally agreed regimes," to the "standard industry test" for phenol coloring, to what "[o]ne would normally see" on an independent inspector's report, to the "normal practice" of independent inspectors, and to other similar norms. (East Report ¶¶ 3.8, 4.3, 4.5; see also ¶ 6.8).[4] The East Declaration

merely summarizes, formalizes, and contextualizes references to these norms. (East Declaration ¶¶ 14–26).

Thus, the East Declaration does not "expound a wholly new and complex approach designed to fill a significant and logical gap," but rather "support[s] an initial position," and is within the bounds of Mr. East's report. *Point Productions A.G.*, 2004 WL 345551, at *9; *accord Lidle II*, 2010 WL 2674584, at *7 n. 4. Because the East Declaration is within the scope of the expert evidence originally presented to the Court and appropriately submitted after discovery, its submission did not violate Rule 26 of the Federal Rules of Civil Procedure and therefore is not subject to preclusion under Rule 37. *Atkins v. County of Orange*, 372 F.Supp.2d 377, 395 (S.D.N.Y.2005), *aff'd sub nom. Bellotto v. County of Orange*, 248 Fed.Appx. 232 (2d Cir.2007).

### 3. *Motion to Strike the Gijbels Affidavit*

■ Finally, Dongbu argues for the exclusion of the Declaration of Erik Gijbels because it was untimely under Local Civil Rule 6.1. (Defendant Dongbu Hannong Chemical Co., Ltd.'s Reply Memorandum of Law in Further Support of Motion to Strike the Declaration of Martin East and the Gijbels Affidavit at 8–9; Declaration of Erik Gijbels dated March 11, 2010 ("Gijbels Aff."), attached as Exh. A to Lillis 11/8/10 Aff.). Cedar concedes that the Gijbels Affidavit is untimely but argues that

---

3. Mr. East also testified extensively regarding his background at deposition. (Deposition of Martin East dated July 16, 2009 ("East Dep. 1"), attached as Exh. 4 to Lillis Aff., at 6–13; Deposition of Martin East dated July 16–17, 2009 ("East Dep. 2"), attached as Exhs. 1–2 to Affidavit of John T. Lillis, Jr., dated Nov. 8, 2010 ("Lillis 11/8/10 Aff.") at 407–19). Although deposition testimony "does not cure a failure to provide Rule 26 disclosure," in this instance it would tend to demonstrate that any Rule 26 violation was "harmless" under a

Rule 37 analysis. *See Commercial Data Servers, Inc.*, 262 F.Supp.2d at 61–62 (declining to award "drastic remedy" of Rule 37 sanctions although expert affidavit went "well beyond" expert report).

4. As with his background, Mr. East was questioned about and testified regarding "standard industry practice" during his deposition by the defendant's counsel. (East Dep. 2 at 104, 105, 110, 112–15, 159, 161–63, 165, 167–68, 170, 240, 423, 471, 475–76).

the untimeliness "did not unfairly prejudice Dongbu and is substantially justified." (Motion to Strike Opp. Memo. at 7–8). Cedar argues that the affidavit's late filing was "due to unforeseen circumstances outside of Cedar's control" because Mr. Gijbels required approval from several parties before executing the affidavit, and these parties delayed in granting that authorization. (Motion to Strike Opp. Memo. at 7–8). Cedar also notes that the substance of this declaration was "fully set forth" in Cedar's memorandum in opposition to Dongbu's motion for sanctions. (Motion to Strike Opp. Memo. at 7; Memorandum of Law in Opposition to Dongbu's Motion for Sanctions ("Sanctions Opp. Memo.") at 8).

■ Untimeliness in purely procedural matters may be forgiven on grounds of " 'excusable neglect.' " *Lee v. ITT Standard,* 268 F.Supp.2d 315, 329–30 (W.D.N.Y.2002) (quoting Fed.R.Civ.P. 6(b)(1)(B)), *report and recommendation adopted by Estate of Lee v. ITT Standard,* 268 F.Supp.2d 356 (W.D.N.Y.2003). While instances of "excusable neglect" are " 'not limited strictly to omissions caused by circumstances beyond the control of [the] movant,' " *LoSacco v. City of Middletown,* 71 F.3d 88, 93 (2d Cir.1995) (quoting *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership,* 507 U.S. 380, 392, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993)), they certainly can encompass such instances. And indeed, he concept of "excusable neglect" "may encompass delays caused by inadvertence, mistake, or carelessness, at least when the delay was not long, there is no bad faith, there is no prejudice to the opposing party, and movant's excuse has some merit." *LoSacco,* 71 F.3d at 93 (internal quotation marks and citations omitted). Here the delay was, at worst, caused by the plaintiff's carelessness in failing to plan ahead for the execution of the Gijbels Affidavit. There are no allegations of bad faith, and there is at least some merit to

the plaintiff's contention that the delay in execution of the affidavit was outside its control. (Lills 11/8/10 Aff., ¶¶ 4–13). Finally, there is no prejudice to Dongbu; the affidavit makes straightforward factual assertions that are summarized in Cedar's memorandum in opposition to Dongbu's sanctions motions. *See Lee,* 268 F.Supp.2d at 329–30 (admitting late deposition papers where they were omitted by inadvertence and "previously referenced" in papers to which they should have been annexed such that other party had opportunity to respond to related arguments). Therefore, the Gijbels Affidavit may properly be considered.

### 4. *Exclusion of Expert Witness Testimony and Reports*

■ Under Rule 702 of the Federal Rules of Evidence, "a witness qualified as an expert by knowledge, skill, experience, training, or education" may testify regarding an area of specialized knowledge provided that "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. The proponent of expert testimony must establish its admissibility under this rule by a preponderance of the evidence, although " 'the district court is the ultimate gatekeeper.' " *Arista Records LLC v. Usenet.com, Inc.,* 608 F.Supp.2d 409, 422 (S.D.N.Y.2009) (quoting *United States v. Williams,* 506 F.3d 151, 160 (2d Cir.2007)).

■ Rule 702 codified the standard for admissibility set forth by *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *See Adesina v. Aladan Corp.,* 438 F.Supp.2d 329, 341 (S.D.N.Y.2006). In *Daubert,* the United States Supreme Court confirmed that trial courts should serve as

sentries, preventing juries from being overwhelmed by unsupportable speculation cloaked as expertise. 509 U.S. at 595–96, 113 S.Ct. 2786. As the Court later elaborated, this gatekeeping role applies "not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The Second Circuit has provided further explanation of the trial court's duties when evaluating expert testimony:

> First, … *Daubert* reinforces the idea that there should be a presumption of admissibility of evidence. Second, it emphasizes the need for flexibility in assessing whether evidence is admissible. Rather than using rigid "safeguards" for determining whether testimony should be admitted, the Court's approach is to permit the trial judge to weigh the various considerations pertinent to the issue in question. Third, *Daubert* allows for the admissibility of scientific evidence, even if not generally accepted in the relevant scientific community, provided its reliability has independent support. Finally, the Court expressed its faith in the power of the adversary system to test "shaky but admissible" evidence, and advanced a bias in favor of admitting evidence short of that solidly and indisputably proven to be reliable.

*Borawick v. Shay,* 68 F.3d 597, 610 (2d Cir.1995) (internal citation omitted). "[T]he rejection of expert testimony is the exception rather than the rule." Fed. R.Evid. 702 advisory committee's note; *accord Equal Employment Opportunity Commission v. Morgan Stanley & Co.,* 324 F.Supp.2d 451, 456 (S.D.N.Y.2004); *U.S. Information Systems, Inc. v. International Brotherhood of Electrical Workers Local Union No. 3, AFL–CIO,* 313 F.Supp.2d 213, 226 (S.D.N.Y.2004). This principle is based on the recognition that "our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Amorgianos v. National Railroad Passenger Corp.,* 303 F.3d 256, 267 (2d Cir.2002).

■ However, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Id.* at 266; *accord Ruggiero v. Warner–Lambert Co.,* 424 F.3d 249, 253 (2d Cir.2005). Furthermore, "it is critical that an expert's analysis be reliable at every step." *Amorgianos,* 303 F.3d at 267. Of course, "the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Id.* at 266 (citing *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786). Nevertheless, "conclusions and methodology are not entirely distinct from one another." *General Electric Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Accordingly "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

### a. *Expert Status*

■ Under *Daubert* and Rule 702 of the Federal Rules of Evidence, the first step in determining the admissibility of expert testimony is determining "whether the expert is qualified to testify." *Arista Records LLC,* 608 F.Supp.2d at 422 (citing *Zaremba v. General Motors Corp.,* 360 F.3d 355, 360 (2d Cir.2004)). In evaluating a witness's qualifications, the court should first

> ascertain whether the proffered expert has the educational background or training in a relevant field. Then the court "should further compare the expert's

area of expertise with the particular opinion the expert seeks to offer [and permit t]he expert … to testify only if the expert's particular expertise … enables the expert to give an opinion that is capable of assisting the trier of fact." *TC Systems Inc. v. Town of Colonie*, 213 F.Supp.2d 171, 174 (N.D.N.Y.2002) (quoting *Zwillinger v. Garfield Slope Housing Corp.*, No. 94 CV 4009, 1998 WL 623589, at *7 (E.D.N.Y. Aug. 17, 1998)). Moreover, [i]n assessing whether a witness can testify as an expert, courts have liberally construed the expert qualification requirement. An expert should not be required to satisfy an overly narrow test of his own qualifications. In considering a witness's practical experience and educational background as criteria for qualification, the only matter the court should be concerned with is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth. *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, No. 04 Civ. 7369, 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006) (internal citations and quotation marks omitted).

 Under this standard, the plaintiff's proffered experts are unequivocally qualified to testify regarding the discoloration of phenol during its international transport. Martin East spent the first decade of his career working onboard—and often as chief officer of—ocean-going vessels that transported chemicals, including phenol. (East Dep. 1 at 9–11). In this capacity, his responsibility was to ensure "safe transport of the chemicals and to make sure that the product was not contaminated or otherwise negatively impacted." (East Dep. 1 at 12–13). Subsequently, he worked as a marine surveyor, quality assurance manager, and inspector, before becoming a marine cargo consultant. (East C.V.). He was previously employed by the American Bureau of Shipping and is currently a consultant for MTD, which is one of the largest consultancies on petroleum and petrochemical matters in the world. (East C.V.; Minton Dep. 1 at 441–42). Mr. East's primary responsibility throughout his tenure at MTD has been the investigation of chemical contaminations, including at least one other investigation that involved phenol. (Deposition of Martin East dated July 16, 2009, attached as Exh. 12 to Schiff Aff. ("East Dep. 3"), at 51). All told, Mr. East has worked in the shipment of marine cargo for over three decades. Thus, although he is not a chemist, his substantial experience in the shipping of petrochemicals renders him "capable of assisting the trier of fact" in understanding the context of chemical shipment as well as evaluating the timing and causation of the phenol discoloration that took place at some point on its transoceanic voyage. *TC Systems Inc.*, 213 F.Supp.2d at 174.

John Minton holds a bachelor of science in chemical engineering and a post-graduate degree in statistics. (Minton Dep. 1 at 60, 62; Curriculum Vitae of John E. Minton ("Minton C.V."), attached as Appx. 2 to Report of John Minton dated Feb. 2, 2010 ("Minton Report"), attached as Exh. 11 to Schiff Aff.). He is the owner, chief executive, and managing director of MTD, which has six international offices and about 100 employees. (Minton Dep. 1 at 66–67; Minton C.V.). He has worked at MTD since 1968, first in the ship repair industry and later doing cargo inspections. (Minton Dep. 1 at 67–68; Minton C.V.). He has been personally involved in over 1000 investigations of "shortage or contamination cases on individual gas or liquid cargo shipments" or "major refinery loss[es]," and has attended 400–500 ship operations in which product samples were taken. (Minton C.V.; Minton Dep. 1 at 130). Approximately one-quarter of MTD's cases

involve petrochemicals, and Mr. Minton has "been involved with discussions with chemical companies about shipping phenol and phenol problems off and on over the years" and has led investigations of "a series of problems" involving phenol. (Minton Dep. 1 at 320, 336, 389, 456). He is "knowledgeable" about phenol and has personally handled and tested phenol, although he contends that no one "has all the answers" about phenol because it is "not well understood." (Minton Dep. 1 at 76, 141). He has testified numerous times as an expert witness in cases related to petroleum or petrochemical cargoes. (Minton Dep. 1 at 392, 431). Although he is not an "academic chemist," Mr. Minton is an "applied chemist," whose area of expertise thus encompasses the central conflict of this litigation. (Minton Dep. 1 at 65). As with Mr. East, Mr. Minton has substantial practical experience with the subject matter of this litigation and is thus likely to "assist the trier of fact in arriving at the truth." *Johnson & Johnson Vision Care, Inc.,* 2006 WL 2128785, at *5.

### b. *Sufficient Data*

■■■ Dongbu seeks to exclude the reports and testimony offered by the plaintiff's experts because they draw their conclusions "[w]ithout having interviewed anyone, without having the full inspection reports, without having performed [their] own tests, [and] without having reviewed all of the relevant documents." (Experts Memo. at 9, 17–18). In particular, the defendant notes that an early report by Mr. East identified a number of gaps in the information on which he based his conclusion, suggesting possible laboratory work that could be conducted in order to identify the cause of the phenol's discoloration and listing documents he would need to review in order to do a full investigation. (Experts Memo. at 9–10; MTD E-mail Report dated Aug. 17, 2005 ("MTD Report 8/17/05"), attached as Exh. 28 to Schiff Aff., at 7–8; Letter of MTD dated

June 28, 2006 ("MTD Letter 6/28/06"), attached as Exh. 36 to Schiff Aff., at 5). Deposition testimony by Mr. East and Mr. Minton indicates that they did not pursue these further avenues of investigation before submitting their expert reports and testifying in this case, although it is possible that they did obtain some of the enumerated documents. (Experts Memo. at 15–18; East Dep. 3 at 91, 249, 334, 345; Minton Dep. 1 at 211–12; Deposition of John E. Minton dated May 3, 2010, attached as Exh. 13 to Schiff Aff. ("Minton Dep. 2"), at 215–16, 270–71; E-mail of Thomas M. Grasso dated June 21, 2006, attached as part of Exh. 35 to Schiff Aff.). Dongbu also faults Mr. East for failing to interview anyone involved in transporting, sampling, or testing the phenol in order to identify possible causes of the phenol's discoloration. (East Dep. 3 at 90–92).

■■■ To be admissible, expert testimony is required by Rule 702 of the Federal Rules of Evidence to be "grounded on sufficient facts or data that 'is the product of reliable principles and methods.'" *Arista Records LLC,* 608 F.Supp.2d at 422 (quoting Fed.R.Evid. 702(2)). "Expert engineering testimony may rest on scientific foundations or on the personal knowledge or experience of the engineer," and "trained experts commonly extrapolate from existing data." *Santoro ex rel. Santoro v. Donnelly,* 340 F.Supp.2d 464, 473 (S.D.N.Y.2004); *accord Kumho Tire Co.,* 526 U.S. at 150, 119 S.Ct. 1167 (noting flexible *Daubert* analysis "may focus upon personal knowledge or experience"). Experts need not have actually collected the data on which they base their conclusions in order to be credible. *See* Fed.R.Evid. 703 ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing."); *accord Gussack Realty Co.*

*v. Xerox Corp.*, 224 F.3d 85, 94 (2d Cir. 2000) ("[A]n expert may rely on data that she did not personally collect."). Questions over whether there is a sufficient factual basis for an expert's testimony may "go to weight, not admissibility." *Adesina*, 438 F.Supp.2d at 343.

In this case, the experts have based their conclusions on reliable results from tests conducted by independent consultants and observed by representatives of numerous interested parties. The defendant does not seriously contend that these tests are unreliable, merely that their results are not sufficient evidence to support the experts' conclusions. But this argument goes to the weight, not the admissibility, of their testimony and reports. The experts have not made conclusory assertions based on insufficient facts, but rather have made limited assertions tied directly to the limited evidence they had available to them. That they have been upfront about the limitations of their analysis is, in my view, to their credit, and will allow for a more frank assessment of the weight that should be afforded to their conclusions. The experts have also plausibly explained why the uncollected data, while potentially enlightening, was not necessary to their analysis of *when* and *where* (as compared to *why* ) the phenol became discolored. (MTD Report 8/17/05 at 7, 8; MTD Letter 6/28/06 at 1, 6; Minton Dep. 1 at 15, 204–05; East Dep. 3 at 250–52, 295–98). *Cf. Mannion v. Coors Brewing Co.*, No. 04 Civ. 1187, 2007 WL 3340925, at *4–5 (S.D.N.Y. Nov. 7, 2007) (excluding expert testimony where expert admitted that his conclusion was drawn "in the absence of the *necessary* information" that opposing party failed to disclose (emphasis added)).

Furthermore, this is not a case in which the experts have relied only on what the plaintiffs told them. *Cf. Arista Records LLC*, 608 F.Supp.2d at 424–25. Instead, the experts based their conclusions on their own review of documents and the results of testing conducted by independent consultants. Indeed, the experts refused to support the plaintiff's initial theory of the case—that reported results of the initial testing of the phenol from the shore tanks in Ulsan had been fraudulent—when it did not comport with their understanding of the evidence and of the science of phenol discoloration. (Letter of Kennedy Lillis Schmidt & English dated March 27, 2006, attached as Exh. 32 to Schiff Aff.; E-mail of Thomas M. Grasso dated May 9, 2006, attached as part of Exh. 33 to Schiff Aff., ¶¶ v–vi; MTD Letter 6/28/06 at 2–3, 6).

Thus, although the amount of data available to the experts was not overwhelming, it was reliably obtained and sufficient to form the basis of admissible expert conclusions. Whether those facts are sufficient to render their opinions persuasive is a question for the finder of fact.

### c. *Reliability*

Dongbu further alleges that Mr. East's and Mr. Martin's testimony is unreliable, inconclusive, and speculative, and that it should be excluded for the additional reason that they failed to test their hypothesis. (Experts Memo. at 6–22). To be admissible, expert testimony must not only be based on "sufficient facts or data," but must be deemed "the product of reliable principles and methods" which have been "applied ... reliably to the facts of the case." Fed.R.Evid. 702; *accord Amorgianos*, 303 F.3d at 265. Although the Supreme Court in *Daubert* identified a number of factors with which to evaluate the reliability of expert methods, "the *Daubert* inquiry is fluid and will necessarily vary from case to case." *Lynch v. Trek Bicycle Corp.*, 374 Fed.Appx. 204, 206 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Amorgianos*, 303 F.3d at 266). A court need not "admit opinion evidence

that is connected to existing data only by the ipse dixit of the expert." *Joiner,* 522 U.S. at 146, 118 S.Ct. 512. Nonetheless, " '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.' " *Arista Records LLC,* 608 F.Supp.2d at 423 (quoting *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786).

Dongbu's objections to Mr. East's and Mr. Minton's testimony are unavailing. First, many of Dongbu's objections to the "reliability" of Mr. East's and Mr. Minton's testimony are objections to the validity of their conclusions (for example, the conclusion that the tested samples were not off-color because of phenol's natural "susceptibility to discoloration" (Experts Memo. at 15–16; East Dep. 2 at 99; Minton Dep. 2 at 102), and the conclusion that a Bow Flora sample that was barely on-specification did not disprove their hypothesis (Experts Memo. at 19; East Report, ¶ 5.5.iii; Minton Report, ¶ 5.5.iii; Minton Dep. 1 at 161, 190–91)). "[T]he district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos,* 303 F.3d at 266. Further, these conclusions are not " 'connected to existing data only by the ipse dixit of the expert.' " *Id.* (quoting *Joiner,* 522 U.S. at 146, 118 S.Ct. 512). The experts have drawn only limited conclusions regarding the timing and potential causes of the discoloration, which are tied to the existing data by their experience in chemical engineering and the shipping industry, *see Santoro ex rel. Santoro,* 340 F.Supp.2d at 473, and by straightforward logical analysis. The "analytical gap" between their conclusions and the data is not wide. *Cf. Joiner,* 522 U.S. at 146, 118 S.Ct. 512.

Second, to the extent that Dongbu challenges the experts' assumptions (for example, that storage canisters could not have been the cause of a sample's off-color test result (Experts Memo. at 17–18; East Dep. 3 at 215–16, 296–97) or that the phenol was not overheated on the Bow Flora (Experts Memo. at 17; East Dep. 3 at 288)), " 'contentions that assumptions are unfounded go to the weight, not the admissibility of the testimony.' " *Arista Records LLC,* 608 F.Supp.2d at 423 (quoting *Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18, 21 (2d Cir.1996)) (internal quotation marks omitted).

Third, Dongbu specifically criticizes the experts for failing to point to literature that supports their theory that exposure to damaging elements (such as heat or contaminants) will spark a "seeding" reaction that causes phenol to discolor gradually over time. (Experts Memo. at 18–19; East Report, ¶ 5.3.ii; Minton Report, ¶ 5.3.ii; Minton Dep. 1 at 182, 217–22). However, there is no requirement that "an expert must back his or her opinion with published studies that unequivocally support his or her conclusions." *Amorgianos,* 303 F.3d at 266. "[L]ack of textual support may 'go to the weight, not the admissibility' of the expert's testimony." *Id.* (quoting *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1044 (2d Cir.1995)). Furthermore, "seeding" is an expression that both experts used simply to describe and explain a broad chemistry concept. (Minton Dep. 1 at 182, 219–20); *see also U.S. Information Systems, Inc.,* 313 F.Supp.2d at 237 ("It is well settled that an expert is free to offer testimony to provide a background for the case."). This concept appears to be supported by the literature upon which Mr. East's expert report is based, which notes in part that "[p]henol gradually turns pink if it contains impurities or is exposed to heat or

light." (Excerpts from Kirk–Othmer, *Encyclopedia of Chemical Technology* (4th ed. 1993), labeled East 11 and dated July 17, 2009, attached as part of Exh. 22 to Schiff Aff.; Publications referred to during investigations and writing of reports, attached as Appx. 1.2 to East Report).

▮ Finally, Dongbu argues that the experts' testimony and reports should be excluded because they did not "test[ ] their hypothesis" and "cannot disprove other possible explanations for the phenol discoloration." (Experts Memo. at 7, 12–13, 19–22). "While an expert should address evidence that contradicts his conclusions, '[i]t is not required ... that an expert categorically exclude each and every possible alternative cause in order to render the proffered testimony admissible.'" *U.S. Information Systems, Inc.*, 313 F.Supp.2d at 235 (alteration in original) (quoting *Astra Aktiebolag v. Andrx Pharmaceuticals, Inc.*, 222 F.Supp.2d 423, 488 (S.D.N.Y.2002)). As Dongbu acknowledges, both Mr. East and Mr. Minton have frankly admitted that there are potential alternatives to the conclusions they have drawn with respect to the meaning of the data in this case. (Experts Memo. at 19). Nonetheless, both experts have carefully explained why they have rejected various alternative explanations and settled on the conclusions they put forward here. (East Report, ¶¶ 6.1–6.20; Minton Report, ¶¶ 6.1–6.20; East Dep. 3 at 253–56, 288; Minton Dep. 1 at 204–05).

The case law cited by Dongbu to argue that the hypothesis put forth by Mr. East and Mr. Minton should be excluded because it has never been tested is unavailing. (Experts Memo. at 7, 12–13). Expert testimony may be excluded for being "speculative and untested," *Lynch,* 374 Fed.Appx. at 207, and "expert opinions may properly be excluded when based on conjecture rather than evidence in the record," *Allstate Insurance Co. v. Hamilton Beach/Proctor Silex, Inc.,* 473 F.3d 450, 458 (2d Cir.2007). In contrast to the cases cited by Dongbu, in which the experts appeared to base their conclusions on no evidence whatsoever, *see Lynch,* 374 Fed. Appx. at 206–07 (expert formed conclusions "without performing any testing"); *Brooks v. Outboard Marine Corp.,* 234 F.3d 89, 91–92 (2d Cir.2000) (expert formed conclusions about boat crash without having "seen the actual boat" and unaware of its dimensions or design),[5] the experts in this case have drawn limited conclusions based on existing test results and have also explained why additional investigation would likely prove fruitless. (MTD Report 8/17/05 at 7, 8; MTD Letter 6/28/06 at 1, 6; Minton Dep. 1 at 15, 204–05; East Dep. 3 at 250–52, 295–98). "'To the extent [the expert] could have bolstered his conclusions through conducting experiments, that goes to the weight the jury should give the evidence, not its admissibility.'" *Lidle II,* 2010 WL 2674584, at *7 (quoting *Robinson v. Garlock Equipment Co.,* No. 05 Civ. 6553, 2009 WL 104197, at *4 (W.D.N.Y. Jan. 14, 2009)).

"'The grounds for the expert's opinion merely have to be good, they do not have to be perfect. The judge might think that there are good grounds for an expert's conclusion even if the judge thinks that there are better grounds for some alternative conclusion ....'" *Graham v. Playtex Products, Inc.,* 993 F.Supp. 127, 133 (N.D.N.Y.1998). Mr. Minton and Mr. East need not prove beyond a reasonable doubt

---

5. The other case cited by the defendant, *Zaremba,* is entirely inapposite, as it deals with the reliability of a "hypothetical alternative design" that the plaintiffs contended was safer than the actual design of the defendant's car, 360 F.3d at 359–60. The experts in this case have drawn conclusions regarding what actually happened based on actual test results from the phenol that is at issue; their conclusions are thus far less speculative.

that their conclusions are correct; they need only establish that they have reasonably applied reliable methods to sufficient facts. Their reports and deposition testimony satisfy this burden.

## B. *Motion for Sanctions*

In addition to seeking to exclude evidence, Dongbu argues that Cedar's failure to ensure the preservation of the physical samples of the phenol at issue in this case "requires the imposition of the sanction of dismissal." (Defendant Dongbu Hannong Chemical Co., Ltd.'s Memorandum of Law in Support of Motion for Imposition of Sanctions for Spoliation of Evidence ("Sanctions Memo.") at 3).

### 1. *Legal Standard*

 "Spoliation is 'the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *Orbit One Communications, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 435 (S.D.N.Y.2010) (quoting *Byrnie v. Town of Cromwell, Board of Education*, 243 F.3d 93, 107 (2d Cir.2001)); *accord Pension Committee of the University of Montreal Pension Plan v. Banc of America Securities, LLC*, 685 F.Supp.2d 456, 465 (S.D.N.Y.2010); *Richard Green (Fine Paintings) v. McClendon*, 262 F.R.D. 284, 288 (S.D.N.Y.2009). Where spoliation violates a court order, Rule 37(b) of the Federal Rules of Civil Procedure empowers the court to impose various sanctions, including dismissing the complaint or entering judgment by default, precluding the introduction of certain evidence, imposing an adverse inference, or assessing attorneys' fees and costs. Fed. R.Civ.P. 37(b); *see Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 106–07 (2d Cir.2002); *Orbit One Communications, Inc.*, 271 F.R.D. at 435; *Richard Green (Fine Paintings)*, 262 F.R.D. at 288; *Metropolitan Opera Association, Inc. v. Local 100, Hotel Employees and Restaurant Employees International Union*, 212 F.R.D. 178, 219 (S.D.N.Y. 2003). A court may impose discovery sanctions even absent an order pursuant to "its inherent power to manage its own affairs." *Residential Funding*, 306 F.3d at 107; *accord Richard Green (Fine Paintings)*, 262 F.R.D. at 288; *In re NTL, Inc. Securities Litigation*, 244 F.R.D. 179, 191 (S.D.N.Y.2007); *Metropolitan Opera*, 212 F.R.D. at 220. "'The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis.'" *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 430 (S.D.N.Y. 2004) ("*Zubulake V*") (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 436 (2d Cir.2001)); *see also Harkabi v. SanDisk Corp.*, No. 08 Civ. 8203, 2010 WL 3377338, at *8 (S.D.N.Y. Aug. 23, 2010).

 Where a party seeks sanctions based on the spoliation of evidence, it must establish:

(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed "with a culpable state of mind"; and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Residential Funding*, 306 F.3d at 107; *accord Acorn (New York Association of Community Organizations for Reform Now) v. County of Nassau*, No. 05 CV 2301, 2009 WL 605859, at *2 (E.D.N.Y. March 9, 2009); *Richard Green (Fine Paintings)*, 262 F.R.D. at 289; *Treppel v. Biovail Corp.*, 249 F.R.D. 111, 120 (S.D.N.Y.2008); *Zubulake V*, 229 F.R.D. at 430. I will address each of these factors in turn.

## 2. Obligation to Preserve

■ "[O]bligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation ... for example when a party should have known that the evidence may be relevant to future litigation." *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir.1998), *overruled on other grounds, Rotella v. Wood,* 528 U.S. 549, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000); *accord Fujitsu Ltd.,* 247 F.3d at 436. "Thus, the preservation requirement arises when a party reasonably anticipates litigation." *Orbit One Communications, Inc.,* 271 F.R.D. at 436 (internal quotation marks omitted); *accord Pension Committee,* 685 F.Supp.2d at 466; *Treppel,* 249 F.R.D. at 118; *Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212, 218 (S.D.N.Y.2003) ("*Zubulake IV* ").

■ Here, the obligation to preserve was clear: Cedar is a sophisticated commercial actor to whom the likelihood of a dispute over liability for the corrupted phenol was so evident that they notified Dongbu that they were holding them liable for the phenol within days of discovering that it was off-specification. (Cho Decl., ¶ 25; Chu Decl., ¶ 15; Cho E-mail 7/21/05; Dongbu Letter 7/21/05). Furthermore, they undertook immediate testing of those samples in order to identify the party liable for its corruption; indeed, the very purpose of maintaining those samples was for subsequent testing to assign liability in the event something went wrong. *See Innis Arden Golf Club v. Pitney Bowes, Inc.,* 257 F.R.D. 334, 340 (D.Conn.2009) (holding that plaintiffs' efforts to identify party responsible for contaminating their soil for purpose of recovering costs "establishes that litigation was reasonably anticipated from the very beginning of the investigation and remediation process"). Given that the condition of the phenol at various locations and times is the central issue in this case, the duty to preserve samples of that phenol was plain from the very first moment that a dispute over liability for the phenol's corruption arose.

## 3. Culpability

■ "Once a court has concluded that a party was under an obligation to preserve the evidence that it destroyed, it must then consider whether the evidence was intentionally destroyed, and the likely contents of that evidence." *Innis Arden Golf Club,* 257 F.R.D. at 339 (quoting *Fujitsu Ltd.,* 247 F.3d at 436). There is no evidence that Cedar acted in bad faith in failing to preserve the phenol samples; because it did not have physical control over the samples, it did not affirmatively act to destroy them, and in fact it acted to ensure that the Rotterdam Samples were retained for a year following the initial discovery that the phenol was discolored. (Sanctions Opp. Memo. at 8–9; Gijbels Aff., ¶ 13). Nonetheless, "[i]n this circuit, a 'culpable state of mind' for purposes of a spoliation inference includes ordinary negligence." *Richard Green (Fine Paintings),* 262 F.R.D. at 290 (quoting *Residential Funding,* 306 F.3d at 108). Indeed, "[o]nce the duty to preserve attaches, any destruction of documents is, at a minimum, negligent." *Zubulake IV,* 220 F.R.D. at 220.

■ Here, however, Cedar argues that both parties were equally negligent in allowing the samples to be destroyed since both parties enjoyed effective control over the samples and could have acted to preserve them. (Sanctions Opp. Memo. at 11–13, 17–19). " '[T]he test for [ ] production ... is control, not location.' " *In re NTL, Inc. Securities Litigation,* 244 F.R.D. at 195 (quoting *In re Flag Telecom Holdings, Ltd. Securities Litigation,* 236 F.R.D. 177, 180 (S.D.N.Y.2006)). Control does not require "actual physical possession," but rather the "right, authority, or practical ability" to obtain the materials.

*Id.* Cedar plainly had control over the Ulsan Samples because it engaged SGS Korea to take and retain the samples, and because it could have ensured retention and production of the samples through simple written notice to SGS Korea. (Sanctions Opp. Memo. at 12–13). Accordingly, Cedar acknowledges that it had effective control of the Ulsan Samples, but argues that Dongbu had control to an equal extent. (Sanctions Opp. Memo. at 13). Cedar contends that written instruction from either party would have sufficed to save the Ulsan Samples from destruction by SGS Korea irrespective of the fact that Cedar had actually appointed and paid SGS Korea to conduct sampling in this matter. (Sanctions Opp. Memo. at 13). Likewise, Cedar asserts that both Cedar and Dongbu had equal control over the Rotterdam Samples because SGS Netherlands, which was retained by the end buyer of the phenol, would have acted—and indeed did act—on instruction by any of the parties to this transaction. (Sanctions Opp. Memo. at 17–18).

▇▇▇ To be sure, equal negligence by both parties to a litigation in allowing the destruction of evidence renders sanctions unwarranted. *See In re WRT Energy Securities Litigation,* 246 F.R.D. 185, 196 (S.D.N.Y.2007). But because, as I will discuss below, the factors just discussed indicate that Dongbu was not prejudiced by the spoliation of these samples, and thus that sanctions are inappropriate in this case, I need not decide whether the parties were equally culpable in failing to preserve the samples.

*4. Relevance and Appropriate Sanctions*

▇▇▇ Generally, "a party seeking sanctions for spoliation must demonstrate that the evidence destroyed was relevant." *In re WRT Energy Securities Litigation,* 246 F.R.D. at 197. However, "courts must not hold the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence, because doing so would allow parties who have destroyed evidence to profit from that destruction." *Golia v. Leslie Fay Co.,* No. 01 Civ. 1111, 2003 WL 21878788, at *10 (S.D.N.Y. Aug. 7, 2003) (internal quotation marks and alterations omitted). "A moving party may obtain modest sanctions by showing only that the lost evidence was pertinent to its claims. However, where more severe sanctions are at issue, the movant must demonstrate that the lost information would have been favorable to it." *In re WRT Energy Securities Litigation,* 246 F.R.D. at 197.

▇▇▇ Further, appropriate sanctions should be tailored according to " 'the prejudice suffered by the party seeking sanctions,' " *Richard Green (Fine Paintings),* 262 F.R.D. at 291 (quoting *Klezmer v. Buynak,* 227 F.R.D. 43, 51 (E.D.N.Y. 2005)), and "the severity of the sanctions imposed should be congruent with the destroyer's degree of culpability," *id.* at 288; *see also Innis Arden Golf Club,* 257 F.R.D. at 341–42. "Sanctions should be designed to (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *Adorno v. Port Authority of New York and New Jersey,* 258 F.R.D. 217, 227–28 (S.D.N.Y.2009) (internal quotation marks omitted). Case-dispositive sanctions " 'should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions.' " *Arista Records LLC,* 608 F.Supp.2d at 442 (quoting *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir.1999)). "If there is no or nominal prejudice, the likelihood of an adverse inference instruction

becomes nil and lesser sanctions should be considered." *Allstate Insurance Co. v. Gonyo,* No. 8:07–CV–1011, 2009 WL 1924769, at *5 (N.D.N.Y. July 1, 2009) (citing *Residential Funding,* 306 F.3d at 112).

Here, the combination of the opportunities Dongbu had to inspect the samples and its failure to demonstrate the relevance of the samples to its defense according to the spoliation standard indicate that it was not prejudiced by the spoliation of the samples sufficient to justify the drastic sanctions it has requested.[6]

### a. *Opportunity to Inspect*

 The duty to preserve evidence "does not extend indefinitely," *Gaffield v. Wal–Mart Stores East, LP,* 616 F.Supp.2d 329, 337 (N.D.N.Y.2009) (citing *Hamilton Beach/Proctor Silex, Inc.,* 473 F.3d at 458), and may be extinguished by provision to the opposing party of an "adequate and meaningful opportunity to inspect" the evidence, *Sterbenz v. Attina,* 205 F.Supp.2d 65, 74 (E.D.N.Y.2002). Courts have in many cases been unwilling to award sanctions for spoliation of evidence when the moving party has had an adequate opportunity to inspect the evidence prior to its destruction. *See, e.g., Hamilton Beach/Proctor Silex, Inc.,* 473 F.3d at 458 ("Here, not only did the defendant not request that Plaintiffs preserve the [disputed evidence], [the defendant], through its representative, affirmatively disclaimed any interest in the evidence … after being provided a full opportunity to inspect the items.") *Fujitsu Ltd.,* 247 F.3d at 436 (finding district court's determination that no sanctions were warranted appropriate when the defendant "did not request to inspect the damaged shipping container after [the plaintiff] notified it of the dam-

age, nor at any time … prior to it making the summary judgment motion"); *Gaffield,* 616 F.Supp.2d at 338 ("Plaintiff had ample opportunity in the nearly two years between the accident and the filing of the complaint to inspect the bicycle. Plaintiff did not do so. Accordingly, [the defendant] did not have a duty as to Plaintiff and Plaintiff's motion for sanctions must be denied."); *Sterbenz,* 205 F.Supp.2d at 72 (citing cases involving maintenance of ultimately destroyed evidence for period of time following notice of its existence to opposing party); *Indemnity Insurance Co. of North America v. Liebert Corp.,* No. 96 Civ. 6675, 1998 WL 363834, at *5 (S.D.N.Y. June 29, 1998) ("Where, as here, a party has had some opportunity to view the allegedly defective product in its post-accident state, spoliation motions generally are denied."); *Thiele v. Oddy's Auto and Marine, Inc.,* 906 F.Supp. 158, 162 (W.D.N.Y. 1995) ("In none of the cited cases where spoliation sanctions were imposed did the defendant have the opportunity that [the defendant] and his representatives had to inspect the evidence at the same time it was inspected by plaintiffs."); *cf. Innis Arden Golf Club,* 257 F.R.D. at 340–41 (finding that sanctions were warranted where notice that soil samples would be destroyed was insufficient and that failure to respond to "offer to share data" during "brief preremediation time frame" was not "disclaimer of an interest in the sampling evidence"); *In re WRT Energy Securities Litigation,* 246 F.R.D. at 199–200 (holding that sanctions are appropriate where plaintiffs misled defendants as to "the scope of the plaintiffs' theory of the case," rendering defendants' opportunity to review documents "illusory").

---

6. Cedar contends that the Ulsan and Rotterdam samples should be evaluated independently (Sanctions Opp. Memo. at 10), and indeed, the analysis of the relevance and ap-propriate sanctions for each group of samples is slightly different. They will be treated separately but in tandem in the following analysis.

■ With respect to the Ulsan Samples, Dongbu argues that it "never had the opportunity to have its own experts perform testing on the subject phenol or on the retained samples," (Sanctions Memo. at 2), and that it "was prevented from inspecting or otherwise testing these samples," (Defendant Dongbu Hannong Chemical Co., Ltd.'s Reply Memorandum of Law in Support of Motion for Sanctions ("Sanctions Reply Memo.") at 5). To the contrary, it is undisputed that Dongbu's representative attended and participated in the joint analysis of the Ulsan samples. (Aug. 8 Report at 2; MTD, Joint Analysis Report dated Aug. 9, 2005 ("MTD Joint Analysis Report"), attached as Exh. 18 to Schiff Aff., at 2). Although litigation had not yet commenced at the time of the joint analysis, Cedar had already notified Dongbu that it was holding the defendant responsible for the off-color phenol. (Cho Decl., ¶ 25; Chu Decl., ¶ 15; Cho E-mail 7/21/05; Dongbu Letter 7/21/05). Both Cedar and Dongbu are sophisticated commercial actors, and to the extent that Cedar was at that time responsible for preserving the samples because the likelihood of litigation was apparent, so too was Dongbu sufficiently on notice to conduct any testing of the samples. Dongbu's representative observed the unsealing and testing of the samples without any objection, nor any reported request to conduct more extensive testing or to preserve the samples. (MTD Joint Analysis Report). Dongbu may not now argue that it "was prevented from inspecting or otherwise testing these samples" when its representative was present while the samples were available for inspection and testing.

■ The Rotterdam Samples present a slightly closer case. Dongbu did not have a representative present for the joint analysis of the Rotterdam Samples and therefore can more persuasively contend that it was denied an opportunity to inspect those samples. (Sanctions Opp. Memo. at 18).

However, Cedar ensured the retention of the Rotterdam Samples for a period of nine months following the initial ninety-day period during which they were automatically preserved. (Sanctions Opp. Memo. at 8; Gijbels Aff., ¶¶ 13–14). The samples were not destroyed until after July 28, 2006, more than a year after Cedar notified Dongbu that it was holding Dongbu responsible for the off-color phenol, and two months after Cedar filed this lawsuit. (Sanctions Opp. Memo. at 8; Cho Decl., ¶ 25; Chu Decl., ¶ 15; Cho E-mail 7/21/05; Dongbu Letter 7/21/05; Complaint). Although the post-litigation window of opportunity was relatively brief, Dongbu had a year overall to undertake to inspect the samples. Under the circumstances of this case, this opportunity was adequate to render drastic sanctions inappropriate. Further, that Dongbu did not take advantage of the opportunity casts doubt on the relevance of further testing to its case.

### b. *Relevance*

■ Bolstering the conclusion that Dongbu was provided with adequate opportunity to test the phenol samples is Dongbu's failure to demonstrate the relevance of further testing of these samples to the case. A party seeking sanctions for spoliation of evidence where the evidence was not destroyed in bad faith must "affirmatively 'demonstrate that a reasonable trier of fact could find that the missing [evidence] would support [its] claims.' " *Orbit One Communications, Inc.,* 271 F.R.D. at 439 (first alteration in original) (quoting *Zubulake IV,* 220 F.R.D. at 221). "Such a showing can be made on the basis of extrinsic evidence." *Id.;* accord *Richard Green (Fine Paintings),* 262 F.R.D. at 291 (" 'In other words, the plaintiffs here must present extrinsic evidence tending to show that the destroyed [documents] would have been favorable to their case.' ")

(alteration in original) (quoting *Toussie v. County of Suffolk,* No. 01 CV 6716, 2007 WL 4565160, at *8 (E.D.N.Y., Dec. 21, 2007)). Relevance requires a showing beyond the straightforward assertion that "the opposing party has failed to produce requested information." *Orbit One Communications, Inc.,* 271 F.R.D. at 440.

Dongbu contends that "it is beyond dispute that the spoliated evidence was relevant to this litigation" because "Cedar's entire case rests on its interpretation of the results of the testing of the retained samples" (Sanctions Memo. at 4), and because "[ ]the test results of the phenol samples is the central piece of evidence in this case" (Sanctions Reply Memo. at 5). However, this argument is precisely the type of *ipse dixit* assertion that the relevance prong is designed to guard against. Too, the question here is not whether the *samples themselves* are relevant to the case, but rather whether the *further testing* Dongbu would perform on the now-unavailable samples would be relevant. The samples are unequivocally relevant to the case, broadly speaking, but they have been tested by an independent inspection company during joint analyses observed by several industry representatives. (Aug. 8 Report; SGS Netherlands Witnessing Report; SGS Netherlands Analytical Results). Dongbu has not suggested that the tests already performed on the samples are unreliable, nor has it identified any specific tests that will shed more light on the timing or source of the phenol's discoloration. The defendant's criticism of the expert witnesses does point to some additional laboratory analyses that the experts indicated could have been performed on the phenol samples. (Minton Dep. 1 at 201; East Dep. 3 at 249–52, 286–87, 289–90). Two types of laboratory analysis are suggested: an analysis to determine whether any contaminant particles are present in any of the samples and simulations to be run on shore tank samples of the phenol. (MTD Report 8/17/05 at 7). But the experts indicated that any test for contaminant particles was unlikely to be sufficiently sensitive and therefore would be of limited value. (MTD Report 8/17/05 at 7; East Dep. 3 at 250–52). Further, any simulations run on shore tank samples would have required approximately five liters of phenol from the shore tank—in other words, the drawing of additional samples of phenol in the manufacturer's possession—and would have been "difficult," although not impossible, to arrange. (East Dep. 3 at 289–90). In any event, Dongbu has not introduced any extrinsic evidence contradicting the assertion of Cedar's expert witnesses that color change in phenol is "a very poorly understood subject" in which "[e]ven with a great deal of research, the norm is not to know exactly why color is changed," that "the testing that's ... done to try to establish the cause of discoloration of phenol ... is generally unsuccessful," and that "it is highly unlikely that either extensive testing or laboratory simulations will ever demonstrate the cause of this problem." (Minton Dep. 1 at 15; East Dep. 3 at 251; MTD Letter 6/28/06 at 1). The shortcoming in Dongbu's argument, then, is not the failure to prove precisely what any tests run on the samples would show, but the failure to prove that additional tests run on the samples would show anything. (*Cf.* Sanctions Reply Memo. at 6).

Additionally, other evidence about the circumstances under which the phenol discolored is still available to Dongbu. *See, e.g., Golia,* 2003 WL 21878788, at *10 (refusing to award harsh sanctions because "defendant's misconduct has not robbed plaintiffs of the only evidence on which they could base their case"). As was discussed above, much of Dongbu's criticism of the plaintiff's expert witnesses is directed toward its failure to perform a variety of investigations into the causation of the

discoloration, including interviewing the parties responsible for transporting the phenol and the parties responsible for sampling, storing, and testing the phenol. Yet all of these avenues of investigation are still open to the defendants; there is no reason individuals involved in the transportation and sampling of the phenol could not be called as witnesses at trial (nor any reason Dongbu could not have deposed them during discovery).

This case is distinguishable from *Innis Arden Golf Club.* In that action, the plaintiff was responsible for destroying physical samples that it had an unequivocal duty to maintain. 257 F.R.D. at 339–41. The court found that, even though the plaintiff did not "purposefully" destroy the samples in order to gain an advantage, "the consequences of the loss of this evidence are significant and cannot be adequately remedied" except by preclusion of the results of any testing previously performed on those samples. *Id.* at 343. In so holding, the court focused on the fact that the plaintiff "not only did not perform all the tests that it believed to be relevant before the samples were destroyed, it precluded [the defendant] from running potentially exculpatory tests by failing to preserve [the] material." *Id.* at 341. However, in *Innis Arden,* the defendant was able to point to specific tests that could have yielded results conclusively demonstrating that it was not at fault for contaminating the soil. *See id.* at 340–41 (discussing several analyses that could "pin down a time frame" for contamination and "correlat[e] the chemical 'fingerprint'" of contaminants in plaintiff's property with those emanating from defendant's). Additionally, in that case the court found that two-week window the defendants had to inspect the samples was too brief and that they had not received any notice that the samples would be destroyed. *Id.* at 336–37, 340, 341.

Ultimately, the determination whether to award sanctions for spoliation of evidence is a highly fact-specific inquiry. The facts in this case do not merit the drastic remedy of dismissal, nor of an adverse inference that would have virtually the same result. Dongbu's failure to demonstrate the relevance of any testing it might conduct on the spoliated samples, combined with its previous opportunities to preserve and test those samples, demonstrates that sanctions are not appropriate in this case. Although less drastic remedies than dismissal or an adverse inference are sometimes appropriate, *see Arista Records LLC,* 608 F.Supp.2d at 444 (awarding attorneys' fees and costs as a sanction for spoliation of evidence); *In re NTL, Inc. Securities Litigation,* 244 F.R.D. at 201 (awarding costs associated with bringing spoliation motion and noting that monetary awards "may be appropriate"); *Indemnity Insurance Co.,* 1998 WL 363834, at *6–7 (awarding discovery-related sanctions), Dongbu has not suggested any possible alternative remedy in this case.

*Conclusion*

For the reasons set forth above, the defendant's Motion for Sanctions for the Spoliation of Evidence; Motion in Limine to Exclude the Expert Reports of Martin East and John Minton; and Motion to Strike the Declaration of Martin East and the Gijbels Affidavit are denied.

SO ORDERED.